**Hussein NASSAR and Insearch Marketing and Trading Company, Plaintiffs,**

v.

**FLORIDA FLEET SALES INC.; TNC, Inc.; Frederick Roccanti, President of Florida Fleet Sales Inc. and TNC; Fred M. Dellorfano, attorney-in-fact for Florida Fleet Sales Inc.; Ex–Im International, Ltd.; Anthony Dellorfano, President of Ex–Im International; National Bank of Kuwait Sak, New York Branch; Worldwide Surety Company; and Worldwide Business Services Inc., Defendants.**

No. 97 CIV. 9269(DLC).

United States District Court, S.D. New York.

Jan. 6, 1999.

Christopher R. Carpentieri, C.R. Carpentieri, P.C., New York City, for plaintiffs.

Gary K. Wolinetz, Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, Woodbridge, NJ, for defendant National Bank of Kuwait.

Fred M. Dellorfano, Montgomery, PA, Pro se individual defendant.

## OPINION AND ORDER

COTE, District Judge.

Plaintiffs bring this diversity action against a number of different defendants alleging improper breaches of a letter of credit and a series of underlying agreements. Plaintiffs were the first beneficiary to a letter of credit. In the causes of action relevant to the present motion, they complain principally that their sub-contractor wrongfully obtained money under the letter of credit due to errors by the advising and confirming bank with respect to one transfer made on presentation of a performance bond and another made to an escrow account. The advising and confirming bank under the letter of credit now moves for summary judgment. Plaintiffs make a cross motion for summary judgment. For the reasons stated, the bank's motion for summary judgment is granted in full and plaintiffs' motion is denied.

## BACKGROUND

Plaintiff Hussein Nassar was in the business of exporting cars and the sole proprietor of plaintiff Insearch Marketing and Trading Company ("Insearch"), a business located in Texas at the time of the relevant transactions. After the Gulf War in August 1991, Al–Jazira Trading Company ("Al–Jazira"), a Kuwaiti company, entered into a contract with the Kuwaiti government to supply 100 armored General Motors trucks to be used at the first meeting of the member states of the Gulf Cooperation Council in Kuwait on December 25, 1991. In order to obtain the trucks, Al–Jazira entered into an agreement with Insearch and Mr. Nassar in the amount of $3,036,625. Insearch then sought a subcontractor and entered into a similar agreement with Florida Fleet Sales Inc. ("Florida Fleet"). Nassar had no previous dealings with the principals of Florida Fleet and subcontracted with them because they looked "like good people." The purchase price of the trucks under this agreement was $2,286,995. The agreements called for shipping the trucks by ocean freighter prior to November 10, 1991, to assure they would arrive in time for the conference.

Payment under the agreement between Insearch and Al–Jazira was to be effected through a letter of credit issued by the National Bank of Kuwait in Safat, Kuwait ("NBK Kuwait") with the National Bank of Kuwait in New York, New York ("NBK New York") serving as the United States advising and confirming bank. Al–Jazira applied to NBK Kuwait to issue an irrevocable letter of credit in the amount of $3,036,625, with Insearch named as the first beneficiary. NBK Kuwait issued the letter of credit by telex on October 7, 1991.

NBK New York advised Insearch of the letter of credit on October 8, 1991.

Under its terms, the letter of credit was to function as follows: Upon meeting certain conditions specified in the letter of credit, involving the presentation of documents describing the vehicles and bills of lading from the shipment, the first beneficiary Insearch would be permitted to be paid in the form of a draw on the letter of credit. As the advising and confirming bank, NBK New York would assure that the conditions had been met and make the payments to Insearch. The letter of credit was irrevocable and expired on November 18, 1991, meaning that Insearch had to present all of the required documents before this date to be paid.

*Performance Bond Advance*

As written, the letter of credit permitted Insearch to draw twelve percent of the balance of the credit:

> immeidiately [sic] upon presentation of their simple receipt in triplicate accompanied by an unconditional performance bond issued or confirmed by [NBK New York] in favor of applicant, valid until 31st December 1991 and payable on applicant's first demand . . . .

On the day of the issuance of the letter of credit, this provision was amended to change the percentage to ten percent of the total, or $303,662.50. In addition, the language "unconditional performance bond issued or confirmed by [NBK New York]" was amended to read instead "performance bond for [$364,395.00] on the standard format issued by a recognized insurance company legally operating under U.S. laws or issued and confirmed by [NBK New York]." [1]

At NBK New York, the letter of credit was handled by Athanasia "Soula" Stephanides, the supervisor of the bank's letter of credit department. On the day of the issuance of the letter of credit, Ms. Stephanides met with Mr. Nassar of Insearch and Fred M. Dellorfano,[2] the attorney for Florida Fleet, who had previously contracted with Insearch to ship the vehicles. At the meeting, the parties reviewed a performance bond dated October 7, 1991 and issued by Worldwide Business Services, Inc. ("Worldwide"). By its terms, the performance bond binds Worldwide to make payments to *Al–Jazira and Insearch* in the amount of $364,395.00 to guarantee *Florida Fleet's* performance under the October 7, 1991 agreement until the termination date of December 31, 1991.[3] The bond is signed by Mr. Nassar as agent for Al–Jazira[4] and Mr. Dellorfano, as attorney in fact for Florida Fleet, as well as by a representative of Worldwide.

Nassar claims that he never saw the performance bond prior to this meeting and that he "relied on Ms. Stephanides' statement that the Bond was acceptable and signed the Bond as instructed by Ms. Stephanides." He also alleges that Stephanides knew the performance bond was fraudulent but did not tell him. At her deposition, Stephanides said that she was the NBK New York expert in performance

---

1. Like many of the amendments to the letter of credit, Nassar now claims that although he had discussions with Al–Jazira to amend the language of the letter of credit with respect to the initial draw, he did not agree to the change calling for a performance bond from a recognized insurance company.

2. Fred M. Dellorfano, a defendant to this lawsuit, is the brother of Anthony Dellorfano, another defendant to this lawsuit. Anthony Dellorfano is not involved in the facts related to this motion. All references to a Mr. Dellorfano are to Fred M. Dellorfano.

3. The performance bond as written is at odds with the letter of credit. The letter of credit unquestionably contemplates that Insearch will provide the performance bond for the benefit Al–Jazira. The performance bond as written is provided by Florida Fleet for the benefit of Al–Jazira and Insearch.

4. Stephanides provides no explanation for why Nassar signed as agent for Al–Jazira. Nassar says that she insisted that he sign for Al–Jazira, but that he did not work for Al–Jazira at the time and did not represent it as an agent. Nonetheless, Al–Jazira subsequently approved the performance bond.

bonds, but that she had never seen a performance bond like the one presented at the meeting. She said that Insearch had no reason to be protected by the performance bond. She also stated that the performance bond did not meet the terms of the letter of credit, but that under the amendment, NBK New York was not required to confirm the bond. Further, she stated that the bond "doesn't logically make sense," but that since Al–Jazira had approved it, "even if it is a Mickey Mouse document, it's okay with me."

NBK New York proceeded to fax the performance bond to NBK Kuwait for review by it and by Al–Jazira. Al–Jazira responded on October 9 that "[t]he performance bond dated [October 7] submitted by *Insearch Marketing and Trading Co.* is acceptable to us and we hereby authorized [sic] you to pay 10% of the [letter of credit] value." (Emphasis added.) Although the characterization of these actions is in dispute,[5] it is undisputed that Nassar then executed a document dated October 9 on Insearch letterhead acknowledging receipt of $303,662.50 under the letter of credit. It is also undisputed that Nassar, as principal of Insearch, signed another agreement dated October 10, 1991, that authorized NBK New York to pay the proceeds of the draft of $303,662.50 to Fred Dellorfano.[6] Nassar says that this transfer to Florida Fleet was necessary to allow it to obtain special parts for the trucks. Nassar also says the transfer was made in part in reliance on the performance bond and in part because Dellorfano and Stephanides insisted on making it.

After this transfer, on October 10 Insearch made Florida Fleet a "second bene-

ficiary" under the letter of credit. In a document signed by Mr. Nassar, Insearch irrevocably transferred its rights to draw on the letter of credit up to about $2 million to Florida Fleet. After this time, problems in the performance of the underlying contract began to arise. After Florida Fleet had shipped 10 trucks by ocean freighter, Florida Fleet informed Nassar that it could not deliver the remaining 90 trucks by the November 10, 1991 deadline.

*Payment to Escrow Account*

In order to guarantee arrival by December 25, 1991, it was necessary to transport the remaining 90 vehicles via air shipment. On November 21, 1991, the letter of credit was amended to extend the time for delivery of the remaining 90 vehicles until December 5, 1991 and to require all invoices to be signed by Mr. Al–Asfour, a representative of Al–Jazira.[7] The parties inquired with private air transport carriers but found them to be too expensive. Dellorfano then stated that he had contacts with the office of Senator Sam Nunn and the United States Military Assistance Command, and that the United States Air Force would ship the trucks for $440,000, the cost of the fuel. He then told the parties that the military required payment to be made through an escrow account earmarked for it prior to shipment. Instead of establishing a separate escrow account, which would cause additional delays, the parties agreed to use Dellorfano's personal escrow account to hold the funds.

On December 9, 1991, the letter of credit was again amended.[8] The amendment read as follows:

**5.** While NBK New York contends that this transaction was two transfers, the first to Insearch and the second to Florida Fleet / Dellorfano, Nassar argues that he never actually had control over the funds and that the draw was therefore made to Dellorfano. As discussed below, the Court rejects any argument by Nassar that he never received the funds.

**6.** Here again, Nassar has an alternative explanation. He alleges that he assumed that the

account to which the transfer was made was maintained for Florida Fleet.

**7.** Once again, Nassar claims he was never advised of this amendment by NBK New York.

**8.** Nassar again claims that he was not advised of the amendment or allowed to review it by NBK New York. He also says that the amendment did not reflect the agreement he made

"You are authorised [sic] to advance [$440,000] to be placed in 'escrow' account No.4–125–746 of Fred M. Dellorfano with Rockland Trust Company, Rocklan[d], Massachusetts, ABA No. 4–125–746 with a condition that funds are to be released against presentation of a written guarantee from the proper U.S. army authority that the 90 vehicles have already been transported to Kuwait and provided this guarantee carry [sic] the authorized signatures of representatives of both [Florida Fleet and Insearch] .... This amendment represents total air transportation cost of 90 vehicles and no further claim towards freight from any party will be entertained. If these conditions is [sic] not satisfied within the next 10 days from the date of transfer of funds in the foregoin [sic] 'escrow' account, the amount in full ... will have to be returned back to you.... In case of discrepancies, discuss the discrepancies with [Al–Asfour of Al–Jazira] who has the authority to waive the discrepancies."

As a result of this amendment, on December 9, 1991, Mr. Dellorfano for Florida Fleet, Mr. Nassar for Insearch, and Mr. Al–Asfour for Al–Jazira, executed a letter agreement addressed to Ms. Stephanides. The terms of the letter agreement call for the transfer of $440,000 to Dellorfano's escrow account at Rockland Trust Company. In exchange, Dellorfano agreed to the following:

1. Such funds will be released only against the presentation of a written guarantee from the proper U.S. Government Authority that ninety (90) vehicles have been transported to Kuwait.

2. The guarantee set forth above is agreed to by me on behalf of [Florida Fleet].

3. That the Four Hundred and Forty Thousand Dollars ($440,000.00) received into my account represents the total air transportation cost of ninety (90) vehicles and no further claims towards freight from any party will be entertained.

4. If, within ten (10) days from the date of transfer of the funds into the Escrow Account, the obligations set forth above have not been fulfilled, the full amount of Four Hundred and Forty Thousand Dollars ($440,000.00) will be returned back to you.

5. I hereby agree to interest charges to be calculated at the rate of 8.5% for any money cashed from the Letter of Credit prior to the five (5) days holding period in the next five to ten days.

On December 9, 1991, NBK New York transferred $440,000 into the escrow account and reduced the balance on the letter of credit by this amount.

On December 16, 1991, Al–Jazira further extended the letter of credit by "waiv[ing] any discrepancies ... including, but not limited to, the late shipping date and the waiver of the presentation of any airway bill." On December 19, 1991, a final amendment was made to the letter of credit that permitted Al–Asfour of Al–Jazira to extend the date of the escrow account or otherwise dispose of the amount.[9]

*The Current Lawsuit*

Plaintiffs soon realized that Dellorfano and Florida Fleet did not intend to deliver the remaining vehicles as promised. As Nassar stated in his deposition, "[a]fter everything is over, we realized that [Dellorfano] is not an honest man." Insearch then hired a private air charter to make a partial shipment of the trucks and shipped the remaining trucks by ocean freighter. These shipments were paid for by an adjustment to the total purchase price between Al–Jazira and Insearch. Insearch claims it is unable to say how much of the shipping costs it ultimately paid and how much was paid by Al–Jazira because of the complexity of the adjustment.

with Al Jazira. He places fault for this on NBK New York.

9. Again, Nassar claims NBK New York never advised him of the amendment.

On December 25, 1991, in an attempt to minimize its losses and recover some of the money paid out to Dellorfano and Florida Fleet, Al–Asfour of Al–Jazira took action. In a letter to NBK Kuwait, he wrote that "[w]ith reference to the Performance Bond ... please instruct your New York Branch to execute to cash this guranttee [sic] as soon as possible as this Performance Bond will expire on [December 31, 1991]." With respect to the escrow account, he wrote the following, "please instruct your New York branch to send a strong letter to the beneficiary of Escrow account to transfer the money back to [NBK New York] as soon as possible."

Regarding the performance bond, on December 26, 1991, Stephanides responded to NBK Kuwait in a hand written telex that she had made a claim to Worldwide by registered mail to the address on its letterhead but had been unable to locate the company. The business was unlisted and the telephone number stated on the letterhead belonged to a residence in Florida. Worldwide has never been located and has never honored its obligations under the performance bond. Plaintiffs allege that Dellorfano stole $212,563.75 of the money paid to his account on presentation of the bond.

With respect to the escrow account, on December 26, 1991, NBK New York also sent a letter to Dellorfano requesting a refund of the amount paid since the time limit had already run. Dellorfano responded by claiming that Florida Fleet was entitled to the sums and that the money not already spent was going to be transferred to a third party for safekeeping because of Dellorfano's conflict of interest. The funds in the escrow account were also never seen again. Nassar alleges Dellorfano stole them for his own personal use. Dellorfano is currently incarcerated

in federal prison for reasons unknown to this Court.

Seeking to recover the money allegedly stolen by Dellorfano, Nassar and Insearch filed this action on December 16, 1997, six years after the transactions in issue, against most of the parties to the letter of credit as well as the underlying business transaction, including Florida Fleet, Dellorfano, Worldwide, and NBK New York. NBK New York is the only defendant to have answered, except for Dellorfano who has moved to dismiss for lack of personal jurisdiction. NBK New York is implicated in two of the causes of action on the theory that it made improper transfers under the letter of credit that reduced the amount of money ultimately available to plaintiffs.[10] The first cause of action alleges that NBK New York wrongfully advanced $303,-662.50 in connection with performance bond. The second alleges that NBK New York wrongfully disbursed $440,000 to the escrow account without the proper restrictions. NBK New York has now moved for summary judgment with respect to both claims. Plaintiffs have made a cross-motion for summary with respect to both claims.

## STANDARDS

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91

---

**10.** Insearch does not dispute that it still made $100,000 on the transaction or contend that any other amount it was due under the letter of credit was unpaid. As stated above, In-

search eventually settled the amounts owed with Al–Jazira directly, through an "adjustment" that Nassar stated in his deposition was too complex to be explained.

L.Ed.2d 265 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P.; *accord Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir.1994). In deciding whether to grant summary judgment, therefore, this Court must determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the fact in dispute is material based on the substantive law at issue.

## DISCUSSION

### I Applicable Law

■ Both of the parties argue the case under New York law and thereby have consented to application of New York law as the law of the forum state. *See American Fuel Corp. v. Utah Energy Development Co.*, 122 F.3d 130, 134 (2d Cir.1997); *3Com Corp. v. Banco de Brasil, S.A.*, 2 F.Supp.2d 452, 456 (S.D.N.Y.1998). *See also Optopics Laboratories Corp. v. Savannah Bank of Nigeria, Ltd.*, 816 F.Supp. 898, 902–05 (S.D.N.Y.1993) (discussing New York interest analysis in letter of credit cases). The letter of credit here states that it is governed by the 1983 version of the Uniform Customs and Practice for Documentary Credits, Publication 400 ("UCP"), a collection of letter of credit standards and practices developed by the International Chamber of Commerce and published approximately every ten years. Under New York law, a letter of credit that states it is subject to the UCP is specifically exempted from the Uniform Commercial Code provisions dealing with letters of credit, codified at Article 5. *See* N.Y. U.C.C. § 5–102(4) (McKinney 1998). Nonetheless, pre-UCC case law, codified at N.Y. U.C.C. § 5–114, is still applicable to letters of credit subject to the UCP. *See Mennen v. J.P. Morgan & Co.*, 91 N.Y.2d 13, 666 N.Y.S.2d 975, 980, 689 N.E.2d 869

(1997). In addition, courts frequently look to Article 5 as persuasive authority for gaps in the UCP so long as it does not conflict with the UCP. *See Rockwell Int'l Sys., Inc. v. Citibank, N.A.*, 719 F.2d 583, 588 (2d Cir.1983); *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank*, 707 F.2d 680, 686 (2d Cir.1983); *Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.*, 612 F.Supp. 1533, 1542–43 (S.D.N.Y.1985), *aff'd*, 808 F.2d 209 (2d Cir.1986).

### II Letter of Credit Principles

Although frequently stated, the general principles applicable to letters of credit were summarized by the Second Circuit in *Alaska Textile Co. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813 (2d Cir.1992), a case that dealt, like the present action, with a letter of credit subject to the 1983 UCP. A simple letter of credit involves three parties: the buyer (called the "account party" or "applicant"), the buyer's bank that issues the letter of credit (the "issuing bank"), and the seller of the goods to be paid for (in the form of "draws") under the letter of credit. Letters of credit developed under the law merchant to facilitate payment in sales transactions. They are a useful commercial device because they provide an efficient way to substitute a credit-worthy party (normally a bank) for the buyer. *Id.* at 815. This efficiency arises from the simplicity of the transaction; the seller gets paid once it presents the required documents to the issuing bank. To succeed, three different agreements are required: an underlying agreement for the sale of goods between the buyer (applicant) and the seller (beneficiary), an agreement for the creation of the credit between the buyer (applicant) and the bank, and the letter of credit, which is an irrevocable promise by the bank to pay the seller (beneficiary) on the presentation of certain documents. *Id.*

■ Letters of credit are unique commercial instruments and are governed by their own unique rules. *Mutual Export*

*Corp. v. Westpac Banking Corp.*, 983 F.2d 420, 423 (2d Cir.1993). Traditional contract principles only apply to the extent that they do not interfere with these rules. *Id.* Two general principles overshadow letter of credit litigation. The first principle, the independence principle, was explained in *Alaska Textile* as follows:

> The fundamental principle governing documentary letters of credit and the characteristic which gives them their international commercial utility and efficacy is that the obligation of the issuing bank to [honor] a draft on a credit when it is accompanied by documents which appear on their face to be in accordance with the terms and conditions of the credit is independent of the performance of the underlying contract for which the credit was issued. This independence principle infuses the credit transaction with the simplicity and certainty that are its hallmarks. The letter of credit takes on a life of its own as manifested by the fact that in credit operations all parties concerned deal in documents, not in goods, services, and/or other performances to which the documents may relate.

*Alaska Textile*, 982 F.2d at 815–16 (internal citations and quotations omitted). This independence principle is embodied in the UCP. *See* UCP Article 3, 4. The principle generally persists even where there is fraud in the underlying transaction. *See* UCP Article 16(a); *Semetex Corp. v. UBAF Arab American Bank*, 853 F.Supp. 759, 770 (S.D.N.Y.1994).

Given the focus on conforming documents rather than the substance of the underlying transaction, strict compliance is required with the terms of the credit. Strict compliance is the second principle of letter of credit law. As explained by the Second Circuit:

> Because the credit engagement is concerned only with documents, the terms and conditions of a letter of credit must be strictly adhered to.[ ] There is no room for documents which are almost the same, or which will do just as well. This rule of strict compliance finds justification in the bank's role in the transaction being ministerial, and to require it to determine the substantiality of discrepancies would be inconsistent with its function. Issuers are likewise held to rigorous standards. If the documents do comply with the terms of the credit, the issuer's duty to pay is absolute, regardless of whether the buyer-account party complains that the goods are nonconforming. Issuers, moreover, must swiftly and carefully examine documents submitted for payment; and they are estopped from complaining about discrepancies they did not assert promptly.

*Alaska Textile*, 982 F.2d at 816 (internal citations and quotations omitted). As a consequence of this principle, banks assume a duty of examining all documents with reasonable care to assure that they appear to be conforming on their face. *See* UCP Article 15. Because of the exacting nature of this standard, letters of credit, any amendments, and all instructions must be clear and unambiguous. *See* UCP Article 5.

Some letters of credit, such as the one in this transaction, involve additional parties. For example, where there are multiple sellers or the seller uses subcontractors, a letter of credit can have a second beneficiary who is also entitled to draw on the letter of credit up to a specified amount. In addition, in international letter of credit transactions where the issuing bank is not in the same country as the seller to be paid under the letter of credit, an "advising and confirming bank" in the country of the beneficiary is used to effect payment and receive the documents. *See Bank of Cochin*, 612 F.Supp. at 1539. Under UCP Article 10(b), the advising and confirming bank assumes strict compliance duties similar to that of the issuing bank:

> When an issuing bank authorizes or requests another bank to confirm its irrevocable credit and the latter has added its confirmation, such confirmation con-

stitutes a definite undertaking of such bank (the confirming bank), in addition to that of the issuing bank, provided that the stipulated documents are presented and that the terms and conditions of the credit are complied with . . . .

UCP Article 10(b).

The sales transaction here involved both a second beneficiary and an advising and confirming bank. Put in letter of credit terms, the parties align themselves as follows: Al–Jazira (the buyer) was the applicant or account party, NBK Kuwait was the issuing bank, NBK New York was the advising and confirming bank, Insearch (the seller) was the first beneficiary, and Florida Fleet (the seller's subcontractor) was the second beneficiary.

### III   Plaintiffs' Claims

#### A.   Performance Bond Transfer

Plaintiffs' first claim against NBK New York arises from the payment of $303,-662.50 to the plaintiffs and then to Dellorfano out of the letter of credit funds after the presentation of the Worldwide performance bond purporting to guarantee Florida Fleet's performance. Plaintiffs argue they were injured because NBK New York made the transfer to Dellorfano and because NBK New York made the transfer when it knew the performance bond did not conform to the requirements of the letter of credit.

■ Initially, the Court rejects in its entirety plaintiffs' argument for the simple reason that the $303,662.50 was paid first to the plaintiffs, and only with plaintiffs' consent, thereafter transferred to Dellorfano. As stated above, it is uncontested that Nassar signed documents both acknowledging the receipt of the proceeds and assigning the proceeds to Dellorfano. Any argument that plaintiffs therefore did not receive the proceeds is without merit. Moreover, plaintiffs' theory that "physical possession" is necessary to any valid transfer of funds finds no support in the law. Cf. N.Y. U.C.C. § 4–A–406(1) (in context of

funds transfer between banks, payment is deemed to have been made to beneficiary when a payment order for the benefit of the beneficiary is accepted by the beneficiary's bank). The UCP itself allows beneficiaries freely to assign the proceeds of a draw. See UCP Article 55; Algemene Bank Nederland, N.V., v. Soysen Tarim Urunleri Dis Ticaret Ve Sanayi, A.S., 748 F.Supp. 177, 182 (S.D.N.Y.1990) (discussing assignment of proceeds under UCP). As a result, any claim against NBK New York is dismissed to the extent that it relies on the fact that NBK New York paid Dellorfano. The facts are undisputed that Nassar accepted and participated in the transfer.

■ In addition, plaintiffs' argument that they were injured when NBK New York breached its duty to ensure that the performance bond conformed to the letter of credit rests on several erroneous assumptions. The reality is that any breach of duty inured to the plaintiffs' benefit. It was the plaintiffs that were paid out of the proceeds of the letter of credit. Plaintiffs have failed to point to a single case where a beneficiary recovered against an issuing or advising and confirming bank after required payments were made to the beneficiary under the letter of credit. To the contrary, there is authority that a beneficiary's recovery against the bank is limited to the amounts that should have been but were not paid out under the letter of credit. See, e.g., Optopics Laboratories, 816 F.Supp. at 909 (under 1974 UCP, plaintiffs' damages fixed, except for interest, at time of letter of credit); Ross Bicycles, Inc. v. Citibank, N.A., 161 Misc.2d 351, 613 N.Y.S.2d 538 (1994) (under 1983 UCP, beneficiary's measure of recovery is amount owed under letter of credit and not actual costs or margin). Since plaintiffs do not contend they are still owed money under the letter of credit, they have no theory supporting recovery. Furthermore, it is worth noting that the New York U.C.C., which deals more extensively in remedies, does not contemplate additional

recovery by the beneficiary in any case where the letter of credit funds have already been paid to the beneficiary. *See* N.Y. U.C.C. § 5–115.[11]

■■ This lack of authority is explained by an analysis of the duties owed by the advising and confirming bank to the beneficiary. Under a letter of credit, the sole duties of the advising and confirming bank with respect to the beneficiary are to make payment once conforming documents are presented and to notify the beneficiary if the documents do not conform. *See* UCP Article 10; *Newport Industries North America, Inc. v. Berliner Handels UND Frank–Furter Bank,* 923 F.Supp. 31, 34 (S.D.N.Y.1996) (under 1993 UCP); *Bank of Cochin,* 612 F.Supp. at 1542. The duty to pay arises when the beneficiary presents conforming documents. *See Beyene v. Irving Trust Co.,* 762 F.2d 4, 6 (2d Cir.1985); *Marino Industries Corp. v. Chase Manhattan Bank, N.A.,* 686 F.2d 112, 115 (2d Cir.1982); *Venizelos v. Chase Manhattan Bank,* 425 F.2d 461, 464 (2d Cir.1970). Although the UCP does not go so far as to adopt the position that the beneficiary makes a warranty to the bank as to the conforming nature of the documents, *see* N.Y. U.C.C. 5–111(1)–(2); *Habib Bank Ltd. v. Convermat Corp.,* 145 Misc.2d 980, 554 N.Y.S.2d 757, 759 (1990), the duty of supplying conforming documents lies on the beneficiary. *See Mutual Export Corp.,* 983 F.2d at 423–24; *Venizelos,* 425 F.2d at 464; *Corporacion de Mer-*

*cadeo Agricola v. Mellon Bank Int'l,* 608 F.2d 43, 47–48 n. 1 (2d Cir.1979); *Full–Bright Industrial Co. v. Lerner Stores, Inc.,* 818 F.Supp. 619, 621 (S.D.N.Y.1993); John F. Dolan, The Law of Letters of Credit ¶ 6.03 (1996). In light of this clear allocation of responsibilities, it would be paradoxical to allow the beneficiary to recover because of a non-conforming document.[12] Plaintiffs are not now in a position to challenge a transfer that they approved and that was made for their benefit.

■ The role of the advising and confirming bank is ministerial, not superintending: to comply with the letter of credit for the benefit of the issuing bank and the applicant. The only reasonable care obligation born by the advising and confirming bank runs in favor of the applicant, not the beneficiary.[13] *See* UCP Article 15. *See also* N.Y. U.C.C. § 5–109 (making clear that reasonable care obligation runs to applicant). The UCP explicitly says that the advising and confirming bank is not in the position of guarantor of all documents. *See* UCP Article 17. As a result, as advising and confirming bank, NBK New York's duty was never to protect Insearch's interest. As beneficiary, Insearch is in no position to challenge documents that it had the duty to submit. Insearch cannot avoid this duty or seek to pass it off to another party.

■■ The principle of strict compliance does not save plaintiffs from this conclu-

---

11. Although not controlling, it is illustrative of the ways in which plaintiffs' claim runs against letter of credit principles that the revised 1993 U.C.C., not adopted in New York, explicitly precludes the plaintiffs' cause of action. *See* U.C.C. § 5–108(i)(1993) ("An issuer that has honored a presentation as permitted or required by this article ... is discharged to the extent of its performance under the letter of credit unless the issuer honored a presentation in which a required signature of the beneficiary was forged.") This revision is not indicated in the official commentary to be one intending to alter existing letter of credit law.

12. Plaintiffs similarly could not assert that the performance bond or the nature of the under-

lying transaction gave it additional rights with respect to NBK New York beyond those permitted by the letter of credit. Under the UCP, the beneficiary is not permitted to "avail himself of the contractual relationships existing between the banks or between the applicant for the credit and the issuing bank" to gain additional rights other the right of payment from the bank. UCP Article 6.

13. As noted above, in the case that the documents are not conforming and the bank decides to dishonor the draw, however, the bank has the additional obligation of informing the beneficiary under Article 16(d).

sion. Although it is true that letter of credit law is demanding with respect to the duties of the issuing bank, this is for the protection of the applicant and the bank itself, not the beneficiary. *See Voest–Alpine Int'l,* 707 F.2d at 682. Here, the letter of credit contemplated that the performance bond would be presented by Insearch to protect Al–Jazira, not Insearch. The mere fact that the performance bond actually benefitted Insearch does not make Insearch a de facto applicant under the letter of credit. As the real applicant, Al–Jazira was entitled to waive the requirements of the letter of credit by accepting nonconforming documents. *See Alaska Textile,* 982 F.2d at 820 (acknowledging that applicant or bank may waive conforming documents requirement); *Voest–Alpine Int'l,* 707 F.2d 680, 684–685 (2d Cir.1983); *Marino Indus.,* 686 F.2d at 117; *North American Foreign Trading Corp. v. Chiao Tung Bank,* 95 Civ. 5189, 1997 WL 193197, at *9 (S.D.N.Y. Apr. 18, 1997); *Western Int'l Forest Products, Inc. v. Shinhan Bank,* 860 F.Supp. 151, 154–55 (S.D.N.Y.1994) (collecting cases). *But see Full–Bright Industrial Co. v. Lerner Stores, Inc.,* 818 F.Supp. 619, 622 (S.D.N.Y.1993). Here, Al–Jazira properly waived the failure of the performance bond to conform to the letter of credit. Under New York law, the test for waiver is whether the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it. *See Alaska Textile,* 982 F.2d at 819; *Voest–Alpine,* 707 F.2d at 685. In this case, the letter from Al–Jazira accepting the performance bond and authorizing payment allows the court to conclude that as a matter of law, noncompliance was waived. *Id.*

In summary, any claim against NBK New York with respect to the performance bond must be dismissed. This is the result regardless of whether the letter of credit's provision regarding a performance bond was properly amended. First, Insearch received the money and therefore has no claim based on the argument that NBK New York paid the wrong party. Second, as a beneficiary under the letter of credit, Insearch is not entitled to recover against NBK New York for any defects in the performance bond.

### B.  Escrow Transfer

Plaintiffs' second claim addresses the transfer by NBK New York of $440,000 of the letter of credit funds to an escrow account controlled by Dellorfano after Dellorfano, Nassar, and Al–Jazira executed a letter agreement providing for the transfer. Plaintiffs' argument that it can recover the $440,000 from NBK New York is apparently as follows: (1) plaintiffs agreed to an amendment of the letter of credit, but not the amendment ultimately adopted, resulting in an injury to plaintiffs, (2) NBK New York was in the position of acting under ambiguous and conflicting instructions, the terms of which should be construed against the bank, and that NBK New York breached the terms of the amendment. The flaw in plaintiffs' arguments stems from the undisputed fact that the transfer was made with the plaintiffs' consent. Regardless of whether the letter of credit is deemed to have been effectively amended, the result is the same: plaintiffs have no claim against NBK New York. As a result, although there may be a question of fact as to whether there was an amendment, there is no material question precluding summary judgment.

■■■■ Assuming first that the amendment to the letter of credit providing for the transfer of $440,000 to the escrow account is deemed to be ineffective, then the transfer to the escrow fund is one outside the letter of credit. Nothing prevents the parties to a letter of credit transaction, however, from entering into an arrangement outside the letter of credit to effect payment for the underlying transaction. *See, e.g., Alaska Textile,* 982 F.2d at 818–19 (contemplating such an arrangement with respect to collection); *Optopics Laboratories,* 816 F.Supp. at 908 (terms of

credit can be altered with consent of all parties). The agreement of all of the parties to follow a different arrangement would be regarded as a waiver of the conditions of the letter of credit, under the law of waiver described above. *Cf. Shin-han Bank,* 860 F.Supp. at 155 (noting that it makes no difference for waiver analysis whether beneficiary or bank seeks waiver). This agreement outside the credit may not, however, create obligations for the bank with respect to the letter of credit. *See* UCP Article 3; *Marino Indus.,* 686 F.2d at 114; *Venizelos,* 425 F.2d at 464. If the letter of credit was not amended, therefore, there is still no basis for a claim against NBK New York.

Furthermore, plaintiffs cannot say that they were injured by the mere fact that NBK New York failed to amend the credit or adopted the wrong amendment. Plaintiffs do not say what additional protections with respect to the escrow transfer, if any, were promised to them by Al–Jazira and not incorporated into the amendment by NBK New York. Although NBK New York did bear the responsibility of advising plaintiffs of the amendment, there is no causal link between this failure and the fact that Dellorfano made off with the money transferred to the escrow fund. That result was occasioned directly by a letter agreement signed by the plaintiffs. NBK New York is not the guardian of the success of the transaction. It owes no duty under the letter of credit to protect the interests of the beneficiary.

■ Assuming instead that the amendment to the letter of credit was validly adopted, plaintiffs argue that NBK New York violated the letter of credit by transferring funds to an unrestricted escrow account. Plaintiffs once again attempt to invoke strict compliance principles to impose exacting duties on NBK New York. As developed in the previous section, however, NBK New York's role in assuring compliance with the amendment is not to protect the beneficiary, who is the party charged with meeting the conditions, or

the success of the transaction in general, but to protect Al–Jazira, the applicant. Here, Al–Jazira was actively involved in making the transfer and clearly waived any discrepancies between the amendment and the escrow transfer that was ultimately made. Plaintiffs provide no cases where recovery is permitted by the beneficiary against the advising and confirming bank because of a failure to comply with the terms of an amendment when the intended transfer is made with the knowledge and consent of the beneficiary.

Even if plaintiffs had a legal basis for recovery against NBK New York, however, the action would still fail since plaintiffs' argument that NBK New York failed to comply with the terms of the amendment is defective as a matter of law. Plaintiffs' argument is predicated on the assertion that there is ambiguity because the amendment could be read both (1) to require the creation of a new escrow account that would only allow release of funds on presentation of the appropriate government guarantee and (2) to permit the use of Dellorfano's personal escrow account where the funds would be unrestricted except for any contractual limitations agreed to by Dellorfano and the other parties. The plaintiffs argue that because of this ambiguity, the provision should be construed against NBK New York as the advising and confirming bank, requiring the provision to be read to require NBK New York to create a new escrow account. Since NBK New York did not create such an account, they argue, NBK New York breached the terms of the amendment.

■ As an initial matter, the question of whether there is ambiguity in a contract is a question of law appropriately decided on summary judgment. *Cf. W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639 (N.Y.1990). Plaintiffs' argument is flawed because there is no ambiguity in the amendment to the letter of credit. The amendment clearly intends that the

parties would use the already existing escrow account of Dellorfano. The amendment includes the name and location of the bank and the number of the account and places the words "escrow account" in quotations to indicate a reference to a particular account. None of the language in the amendment is susceptible to plaintiffs' proposed interpretation that a new escrow account must be created with specific conditions. Instead, the amendment clearly authorizes an advance to Dellorfano's "escrow account" "with a condition that the funds are to be released . . . ." The agreement entered into by the parties was undoubtedly the condition intended by the amendment. Since it is undisputed the agreement executed by the plaintiffs parallels almost word for word the amendment to the letter of credit, there is no argument that the agreement does not otherwise meet the requirements of the amendment. There is no ambiguity in the text of the amendment and therefore no argument that NBK New York did not follow the amendment's terms.[14]

In summary, although there may be a question of fact as to whether or not the final amendment was ultimately adopted, this factual dispute is not material because it does not affect the viability of plaintiffs' claim. Initially, there is no legal authority which supports plaintiffs' claim. Furthermore, if the agreement is not deemed to be amended, plaintiffs have no claim against NBK New York because there is no injury. If the agreement is deemed to be amended, plaintiffs have no claim against NBK New York because NBK New York owed no general duty to protect the beneficiary and because NBK New York complied with the amendment. As a result, plaintiffs' claims with respect to the escrow account must be dismissed.

14. The same result could be reached through two other lines of analysis. First, UCP Article 4 establishes a presumption against non-documentary conditions. Plaintiffs' interpretation should therefore be rejected since it would charge NBK New York with a whole series of non-documentary performances. Second, UCP Article 23 states that strict compliance

## CONCLUSION

For the reasons stated, defendant NBK New York's motion for summary judgment is granted and plaintiffs' motion against NBK New York is denied.

SO ORDERED.

duties do not apply to collateral documents. As advising and confirming bank, NBK New York is not responsible for the sufficiency or legal effect of collateral documents such as the escrow agreement. *See Polymer Trading, S.A.R.L., v. CIC–Union Europeenne et Cie,* 225 A.D.2d 482, 640 N.Y.S.2d 32, 33 (1996).