[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 367.]

MID-AMERICA TIRE, INC. ET AL., APPELLANTS AND CROSS-APPELLEES, *v*. PTZ TRADING LTD. ET AL., APPELLEES AND CROSS-APPELLANTS.

[Cite as *Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 2002-Ohio-2427.]

*Ohio Uniform Commercial Code—Letters of credit—Requirement for a court of competent jurisdiction to enjoin the issuer of a letter of credit from honoring a presentation under R.C. 1305.08(B)—Uniform Customs and Practice for Documentary Credits will not replace the relevant provisions of R.C. Chapter 1305, when—R.C. 1305.08(B) is applicable to credit transactions made subject to the UCP, when—Injunctive relief under R.C. 1305.08(B) warranted in a letter of credit transaction, when—"Material fraud" under R.C. 1305.08(B), construed.*

(No. 2001-0020—Submitted January 8, 2002—Decided June 5, 2002.)

APPEAL and CROSS-APPEAL from the Court of Appeals for

Clermont County, No. CA99-11-105.

_____

**SYLLABUS OF THE COURT**

1.  In order for a court of competent jurisdiction to enjoin the issuer of a letter of credit from honoring a presentation under R.C. 1305.08(B), the court must find that the applicant has no adequate remedy at law.

2.  When a letter of credit expressly incorporates the terms of the Uniform Customs and Practice for Documentary Credits (Rev.1993), International Chamber of Commerce, Publication No. 500 ("UCP"), but the UCP does not contain any rule covering the issue in controversy, the UCP will not replace the relevant provisions of R.C. Chapter 1305.

3.  Since the UCP does not contain any rule addressing the issue of injunctive relief where fraud occurs in either the credit documents or the underlying

transaction, R.C. 1305.08(B) remains applicable in credit transactions made subject to the UCP.

4. Material fraud committed by the beneficiary in either the letter of credit transaction or the underlying transaction is sufficient to warrant injunctive relief under R.C. 1305.08(B).

5. "Material fraud" under R.C. 1305.08(B) means fraud that has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation can no longer be served.

_____

**ALICE ROBIE RESNICK, J.**

I

FACTS

A

Overview

{**¶1**} These appeals arise out of an action brought in the Clermont County Court of Common Pleas to enjoin payment under a letter of credit ("LC") on the basis of fraud in the underlying transaction. The underlying transaction involved extensive overseas negotiations toward an agreement to import blemished Michelin tires for sale in the United States. A blemished or "blem" tire is one that is cosmetically but not operationally affected by a surface imperfection.

{**¶2**} The gravamen of the fraud claim is that the overseas seller's agents made certain false promises and representations concerning the sale of more lucrative summer tires in order to induce the American buyers to purchase and open an LC securing the purchase of less lucrative mud and snow tires, many of which could not legally be imported or sold in the United States. The buyers claim that they discovered the fraud after the LC was issued and instructed the seller not to ship the tires, but the seller went ahead with shipment anyway and presented its invoice and shipping documents for payment under the supporting LC. The buyers

2

then instituted this action pursuant to R.C. 1305.08(B), alleging that honoring the LC in this case would facilitate and consummate the seller's fraud.

B

Parties and Participants

{¶3} Given the multilateral nature of the negotiations and arrangements in this case, it is beneficial to provide a working list of the various parties and key participants and their relationships to one another and the transactions at hand.

{¶4} The American parties and participants are as follows:

{¶5} (1)  Plaintiff-appellant and cross-appellee, Mid-America Tire, Inc. ("Mid-America"), is an Ohio corporation doing business as a tire wholesaler. Mid-America provided the financing for the purchase of the tires in this case and was the named applicant by whose order and for whose account the LC was issued.

{¶6} (2)  Arthur Hine is the president of Mid-America and signatory to the LC application.

{¶7} (3)  Plaintiff-appellant and cross-appellee, Jenco Marketing, Inc. ("Jenco"), is a Tennessee corporation doing business as a tire wholesaler. Jenco formed a joint venture with Mid-America to purchase the tires at issue.

{¶8} (4)  Fred Alvin "F.A." Jenkins is the owner of Jenco and also acted as Mid-America's agent in the underlying negotiations.

{¶9} (5)  Paul Chappell is an independent tire broker who resides in Irvine, California. Chappell works as an independent contractor for Tire Network, Inc., a company owned by his wife, and acted throughout most of the negotiations as an agent for Jenco.

{¶10} (6)  First National Bank of Chicago ("First National"), on behalf of NBD Bank Michigan, is the issuer of the LC in this case. First National was a defendant below, but is not a party to this appeal.

{¶11} The European parties and participants are as follows:

**{¶12}** (1)   Defendant-appellee and cross-appellant, PTZ Trading Ltd. ("PTZ"), is an offshore import and export company established in Guernsey, Channel Islands.  PTZ is the seller in the underlying transaction and the beneficiary under the LC.

**{¶13}** (2)   Gary Corby is an independent tire broker operating as Corby International, a trading name of Corby Tyres (Wholesale) Ltd., in Wales, United Kingdom.  Corby was the initiator of the underlying negotiations.  The trial court's findings with regard to Corby's status as PTZ's agent form the subject of PTZ's cross-appeal.

**{¶14}** (3)   John Evans is the owner of Transcontinental Tyre Company located in Wolverhampton, England, and PTZ's admitted agent in the underlying negotiations.

**{¶15}** (4)   Aloysius Sievers is a German tire broker to whom PTZ owed money from a previous transaction unconnected to this case.  Sievers, also an admitted agent for PTZ, procured and shipped the subject tires on behalf of PTZ, and signed and presented the draft for payment under the LC.

**{¶16}** (5)   Patrick Doumerc is the son of the proprietor of Doumerc SA, a French company that is authorized to sell Michelin overstock or surplus tires worldwide.  Doumerc is the person from whom Sievers procured the mud and snow tires for sale to Jenco and Mid-America.

**{¶17}** (6)   Barclays Bank PLC in St. Peter Port, Guernsey, is the bank to which Sievers presented the invoice and shipping documents for payment under the supporting LC.  Barclays Bank was a defendant below, but is not a party to this appeal.

4

C

Events Leading to the Issuance of the LC

{¶18} In October 1998, Corby approached Evans about obtaining large quantities of Michelin winter tires. Evans contacted Sievers, to whom PTZ owed money. Evans knew that Sievers had a relationship with a sole distributor of Michelin surplus tires out of France. Eventually, an arrangement was worked out under which Sievers would buy the tires from Doumerc's warehouse in France and Evans would sell them on behalf of PTZ through Corby to an American purchaser.

{¶19} Meanwhile, Corby contacted Chappell in California and asked whether he was interested in importing Michelin tires on the gray market for sale in the United States. "Gray imports" are tires that are imported without the knowledge or approval of a manufacturer into a market that the manufacturer serves, at a greatly reduced price. Corby told Chappell that he had a large client who negotiated an arrangement directly with Michelin to handle all of its overstock blem tires from France and who could offer 50,000 to 70,000 Michelin tires per quarter at 40 to 60 percent below the United States market price on an exclusive and ongoing basis. Chappell contacted Jenkins in Tennessee, who called Hine in Ohio, and it was arranged that Jenco and Mid-America would pursue the deal through Chappell.

{¶20} On October 28, 1998, Corby faxed Chappell a list of Michelin mud and snow tires that were immediately available for shipment and Chappell forwarded the list to Jenkins. The list was arranged in columns for quantity, size, pattern, and other designations applicable to the European market with which Chappell and Jenkins were unfamiliar. In particular, many of the tires on the list bore the designation "DA/2C." Chappell and Jenkins understood that DA meant "defective appearance," a European marking for a blem, but they were not familiar with the "/2C" portion of the designation. When they asked for clarification, Corby told Chappell that "DA/2C" means the same thing as "DA," but since all of the

listed tires are not warehoused at a single location, "/2C" is used merely to indicate that those blemished tires are located in a different warehouse.

{¶21} Chappell also asked Corby whether he could procure and offer summer or "highway" tires, along with the winter tires. Chappell, Jenkins, and Hine had no interest in purchasing strictly snow tires, as it was already too late in the season to market them profitably. However, they would have an interest in buying both winter and highway tires and marketing them together as a package deal.

{¶22} Corby told Chappell that 50,000 to 70,000 highway tires would be made available on a quarterly basis at 40 to 60 percent below the United States market price. However, when Chappell received another list of available tires from Corby on November 11, 1998, he complained to Corby that this list contained no summer tires and nowhere near 50,000 units. Corby responded that Michelin was anxious to get rid of these tires first, as the market for snow tires in Europe was coming to a close, that a list of summer highway tires would be made available over the next few weeks, and that Chappell and appellants would not have an opportunity to procure the highway tires unless they first agreed to purchase the snow tires. Corby explained that Michelin does not list available summer tires in the mid-month of a quarter. Instead, it waits for these tires to accumulate in a warehouse and then puts out the list at the end of the month. Thus, a list of summer tires would be available over the next few weeks.

{¶23} In a transmission dated November 13, 1998, Corby wrote to Chappell:

{¶24} "The situation is as I explained yesterday, there are no summer tyres available at all but, if, and a very big if, this deal goes ahead we will get all surplus stocks at the end [of] each qu[arter] from now on, but if this deal does not go, then I know we can kiss any future offers good buy [sic]."

{¶25} On November 20, 1998, Corby faxed Chappell a list of summer tires available for immediate shipment, but the listed units were not priced, were composed of many small "odd ball sizes" unmarketable in the United States, and did not approach the 50- to 70,000-range in aggregate quantity. In his cover letter, Corby assured Chappell that "I have of course been in contact with Michelin regarding the list of summer tyres" and "they have confirmed that in the next three/four weeks we have exclusive to us the new list of Michelin summer tyres, quantity unknown as yet, but they believe to be anything from 50,000/70,000 tyres, which would not be too bad for Jan sales." The letter also stated that Michelin was offering the tires at "the price of $1.50 per tyre more than the M & S tyres * * * based on taking the whole lot."

{¶26} On November 23, 1998, Corby faxed the following letter to Jenkins:

{¶27} "Subject: Michelin Tyre Programme.

{¶28} "Dear F.A.

{¶29} "I would just like to confirm our current position with the Off-Shore marketing company that have been authorised to sell all Michelin factory 'Over Stock' tyres. That is, from now on the tyres will only be offered for sale to us through PTZ Trading Ltd., these tyres will come available every two/three months which I have been informed by my contact the next large consignment (not including the current stock of winter/summer tyres) will be in the next three/four weeks time of around 50,000/70,000 tyres.

{¶30} "If our business with the winter tyres goes well, then I see this as [an] extremely excellent opportunity to tap into large consignments of tyres direct from the factory on a regular long term basis.

{¶31} "Just to confirm once again, I have been assured by PTZ Trading who are acting on behalf of the factory that we will have exclusivity to all tyres that come available from now on."

**{¶32}** On December 1, 1998, Evans faxed a letter and "pro forma invoice" (an invoice that sets out in rough terms what the eventual invoice will look like) to Jenkins. The letter stated, "We understand from Gary Corby that you are now about to open the Letter of Credit for the Michelin M&S Tyres."

**{¶33}** However, Chappell and Jenkins were hesitant to have Hine proceed with the financing for the winter tires because they had not yet received concrete information as to the cost and availability of the initial 50,000 to 70,000 summer tires. As Chappell and Jenkins held out for the list of summer tires, Corby and Evans pressed for the LC. While continually assuring Chappell and Jenkins that large stocks of Michelin summer tires would be made available in a short time, Corby and Evans became increasingly insistent about conditioning the offer of summer tires upon the issuance of an acceptable LC in favor of PTZ for the winter tires.

**{¶34}** From early December 1998, through late January 1999, Corby made repeated, often daily, telephone calls to Chappell insisting that Jenkins confirm the issuance of the LC or forfeit the deal entirely. During this time, Corby also sent a number of faxes to Chappell, each one proclaiming that without confirmation of the LC by the end of the day, the offer for the winter tires would be withdrawn and there would be no future offers for winter or summer tires.

**{¶35}** In addition, Evans faxed two messages to Jenkins on January 7, 1999. In the first, Evans wrote:

**{¶36}** "There are large stocks of Michelin summer pattern tyres being made available within the next 7/10 days and we will be pleased to offer these to you when an acceptable Letter of Credit is received for the winter pattern tyres. We will be very happy to work with you on Michelin tyres on a long term basis and give you first option on offers.

**{¶37}** "May we once again stress the urgency of letting us have the Letter of Credit for the Michelin winter tyres so that we can commence business on a long term basis."

**{¶38}** In the second message, Evans informed Jenkins:

**{¶39}** "Further to our fax of today we understand that you would like clarification on future offers made by PTZ Trading Ltd. of Michelin tyres.

**{¶40}** "As we have already indicated we wish to commence a long term business relationship with Jenco Marketing Ltd. [Sic.] We assure you that we will not offer any Michelin tyres that we obtain to any other party in the United States of America provided Jenco Marketing Inc. agree to purchase in a reasonable time."

D

The Issuance of the LC

**{¶41}** By the end of January 1999, Jenkins and Hine were convinced that they had to open the LC for the winter tires as a show of good faith towards the quarterly acquisition of summer tires and that, upon doing so, PTZ would honor its end of the bargain.

**{¶42}** Effective February 1, 1999, and expiring in Guernsey, Channel Islands, on April 2, 1999, First National issued an irrevocable credit at Hine's request in favor of PTZ and for the account of Mid-America in the amount of $517,260.33. The LC provided, among other things:

**{¶43}** "COVERING SHIPMENT OF:

**{¶44}** "14,851 MICHELIN TYPES AT USD 34.83 PER TIRE IN ACCORDANCE WITH SELLER'S PROFORMA INVOICE 927-98 DATED 11-19-98

**{¶45}** "SHIPPING TERMS: EXWORKS ANY EUROPEAN LOCATION

**{¶46}** "* * *

**{¶47}** "THE CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1993 REVISION), INTERNATIONAL CHAMBER OF COMMERCE – PUBLICATION 500."

E

Events Following the Issuance of the LC

**{¶48}** Over the next month, Corby and Evans pushed for shipping arrangements under the supporting LC for the winter tires, while Chappell and Jenkins continued to insist on a conforming price list for the summer tires. As the final LC shipping date approached, and several nonconforming lists of summer tires emerged, the negotiations grew increasingly volatile until they were hostilely terminated.

**{¶49}** A week after the issuance of the LC, Chappell wrote to Corby, "Without the list and pricing [for the summer tires], we are at a standstill with the clock ticking on the winters. Please make every effort to send list during your workday, so we can compile our list for combined sales of both winter and summer units." Corby then faxed Chappell a list of summer tires but, as before, this list contained no prices and fell considerably short of 50,000 units. When Chappell complained, Corby sent another list, which he noted to be six out of 15 sheets of an "original list from Michelin." The other nine sheets, however, were never sent. In any event, this list once again failed to contain the promised quantities of tires, and a considerable number of the listed units were snow tires. Although this list did set forth unit prices, those prices were represented in French francs, and when the French francs were converted into United States dollars, it became apparent that the prices for these units were equal to or in excess of the maximum market prices for a like product in the United States.

**{¶50}** On the morning of February 17, 1999, Evans telephoned Jenkins to inform him that no price list for summer tires would be sent until Barclays Bank received the LC for the winter tires. This caught Jenkins by surprise, as the LC had

been in place since the first of the month and all information pertaining thereto had previously been sent to Evans, but Jenkins nevertheless faxed Evans the LC confirmation number. Throughout that day, Evans made repeated requests for Jenkins to provide him with shipping instructions and orders to release the winter tires. Jenkins responded with several letters that he faxed to Evans on February 17. In these letters, Jenkins informed Evans that he would not authorize the shipment of any winter tires in the absence of a conforming list of summer tires, that any attempt by Evans to ship the winter tires without Jenkins's written consent would be met with legal action, and that the deal would be voided and the LC recalled unless a complete list of competitively priced summer tires arrived in Jenkins's office by February 19.

**{¶51}** On February 19, 1999, Evans faxed the following message to Jenkins:

**{¶52}** "We appreciate your feeling of frustration at the delay in giving you the price for the Summer Tyres but assure you it is only in your best interests to obtain the most favourable prices.

**{¶53}** "* * *

**{¶54}** "Further urgent negotiations are due to take place with Michelin on Monday February 22nd 1999 to see if we can arrive at an acceptable packaged price but of course the final desission [sic] is yours.

**{¶55}** "In the meantime in the interests of all concerned please do not give a specific time for completion if you want us to obtain the most favourable price."

**{¶56}** On February 23, 1999, Corby faxed Chappell another list of summer tires, but this list was illegible in places and irreconcilable with the previous list. Chappell complained and Corby sent another list the following day. However, once again, this list fell well short of 50,000 units, contained many European sizes not used in the United States and various tires not manufactured by Michelin, and stated prices that were often higher than the cost of purchasing the tires one at a time from

most United States dealers. The list also provided that, in addition to the stated prices, appellants were required to pay all shipping, handling, duty, and freight charges. Moreover, Jenkins was now informed that he could no longer pick and choose from among the listed tires, but instead must purchase the entire lot or none at all.

{¶57} On March 1, 1999, Jenkins wrote to Evans, "We are with drawing [sic] our offer effective immediately to purchase the snow package, as PTZ has failed to meet their agreed commitment on the Michelin summer tire offer." (Emphasis deleted.) Jenkins stated that the listed prices for the tires are "not competitive" and "TOTALLY UNACCEPTABLE," and that "[w]e have gone from a reported 50,000 tires to a total offer of about 12,000 tires of which approximately 2,500 of those are TRX tires not sold in this country."

{¶58} Between March 1 and March 5, 1999, Chappell and Jenkins discovered that it was Doumerc, not PTZ, who all along had the direct and exclusive relationship with Michelin to sell all of its overstock and blem tires. They also discovered that Corby had misrepresented the "DA/2C" designation, which attached to many of the tires on the summer lists as well as on the original winter list. Rather than indicating the warehousing location for those tires, "/2C" actually meant that the Department of Transportation serial numbers had been buffed off those units, rendering them illegal for import or sale in the United States.

{¶59} During this time, Jenkins informed Evans that he would notify the United States Customs Service if the DA/2C tires were shipped, and Evans confirmed that he would not ship those tires to the United States. Also, Chappell informed Doumerc of the entire course of events, and Doumerc agreed not to ship the tires until Chappell and Jenkins had the opportunity to come to France, inspect the tires, and resolve the situation.

{¶60} Chappell and Jenkins made arrangements to fly to France, but when they called Doumerc on March 11, Sievers answered the phone. They explained

the entire matter to Sievers and offered to extend the LC expiration date in order to allow for a peaceful resolution. Sievers rejected the offer, however, stating that the winter tires belonged to him, not Doumerc, that he did not care what Doumerc had agreed to, and that "I have a letter of credit and I am shipping the tires."

{¶61} The following day, Mid-America instituted the present action to enjoin payment under the LC. The complaint was later amended to add Jenco as a plaintiff. The trial court granted a temporary restraining order on March 16, 1999, and a preliminary injunction on April 8, 1999.

{¶62} On July 14 and 15, 1999, a trial was held on appellants' motion for a permanent injunction. In a final judgment entry dated October 8, 1999, the trial court granted a permanent injunction against honor or presentment under the LC pursuant to R.C. 1305.08(B). In its separate findings of fact and conclusions of law, the trial court found that the documents presented to Barclays Bank on behalf of PTZ appeared on their face to be in strict compliance with the terms and conditions of the LC. However, the court also found by clear and convincing evidence that PTZ, acting through Evans and Corby, fraudulently induced appellants to open the LC, and that such fraud was sufficient to vitiate the LC. In this regard, the trial court was "satisfied that fraud in the inducement of the issuance of a letter of credit is grounds for a court to grant injunctive relief against the payment of such letter of credit to the beneficiary who perpetrated such fraud."

{¶63} In a split decision, the court of appeals reversed the judgment of the trial court. In so doing, the majority noted that the LC in this case is expressly made subject to the Uniform Customs and Practice for Documentary Credits (Rev.1993), International Chamber of Commerce, Publication No. 500 ("UCP"). Thus, in this case the UCP's terms replace those of R.C. 1305.08(B) with respect to the issues of whether and under what circumstances honor may be enjoined on the basis of fraud. The majority then found that the UCP embodies the "independence principle," under which the issuing bank's duty to honor a conforming presentment

is independent of the underlying transaction. Because the UCP is silent as to any fraud exception to the independence principle, the majority concluded that the UCP necessarily precludes the enjoinment of LC honor on the basis of fraud in the underlying transaction.

{¶64} The appeals court also examined cases decided under former UCC 5-114, which provided an exception to the independence principle where "there is fraud in the transaction." Based on these decisions, the court of appeals recognized that LC honor may be enjoined by a court when the beneficiary commits a fraud so extensive as to vitiate the entire transaction. However, the majority felt that this exception should be narrowly construed to require that the beneficiary's fraud occur in the credit transaction. Thus, the court decided that injunctive relief may be granted on the basis of a beneficiary's presentation of forged or fraudulent documents under an LC, but that such relief may not be granted on the basis of the beneficiary's commission of fraud solely in the underlying sales transaction. After finding that the invoice and shipping documents presented to Barclays Bank on behalf of PTZ conformed strictly to the LC in this case, the majority held the exception inapplicable and injunctive relief inappropriate.

{¶65} The cause is now before this court pursuant to the allowance of a discretionary appeal and cross-appeal.

## II

## ISSUES FOR REVIEW

{¶66} The issue generally presented by both appeals is whether the trial court abused its discretion in granting a permanent injunction against LC honor under the facts and circumstances of this case.

{¶67} The specific questions that arise under the appeal brought by Mid-America and Jenco are as follows:

{¶68} 1. Is the absence of an adequate legal remedy one of the prerequisites for injunctive relief under R.C. 1305.08(B)?

{¶69} 2. With regard to the availability and scope of a fraud exception to the independence principle, is the LC in this case governed by the UCP or R.C. 1305.08(B)?

{¶70} 3. Under the governing law, is there any fraud exception to the independence principle beyond the situation involving the beneficiary's presentation of forged or fraudulent documents? In particular, does the governing law recognize an exception for fraud in the inducement of the underlying contract and the supporting LC?

{¶71} 4. Are the trial court's factual findings sufficient to support the application of a recognized exception to the independence principle?

{¶72} In its cross-appeal, PTZ contends that Corby was not its agent and that appellants could not have justifiably relied on any of Corby's representations. The court of appeals did not reach the merits of these issues. Instead, the court of appeals found that because LC honor may be enjoined only on the basis of fraud in the credit transaction, the trial court should not have even inquired into or taken evidence on the issues of agency and fraud in the underlying contract. Accordingly, we construe PTZ's cross-appeal to be contingent in nature.

III

MID-AMERICA AND JENCO'S APPEAL

A

Inadequate Legal Remedy

**{¶73}** PTZ argues, and the court of appeals held, that appellants should be denied injunctive relief under R.C. 1305.08(B) because they have an adequate remedy at law. Appellants claim that the common-law requirement of irreparable injury is not one of the prerequisites for injunctive relief under R.C. 1305.08(B) and that, in any event, Mid-America does not have an adequate legal remedy.

**{¶74}** It is well settled that an injunction will not issue where there is an adequate remedy at law. See *Haig v. Ohio State Bd. of Edn.* (1992), 62 Ohio St.3d 507, 510, 584 N.E.2d 704; *Garono v. State* (1988), 37 Ohio St.3d 171, 173, 524 N.E.2d 496; *Salem Iron Co. v. Hyland* (1906), 74 Ohio St. 160, 166, 77 N.E. 751.

**{¶75}** However, there is one exception to this rule. "It is established law in Ohio that, when a statute grants a specific injunctive remedy to an individual or to the state, the party requesting the injunction 'need not aver and show, as under ordinary rules in equity, that great or irreparable injury is about to be done for which he has no adequate remedy at law.' " *Ackerman v. Tri-City Geriatric & Health Care, Inc.* (1978), 55 Ohio St.2d 51, 56, 9 O.O.3d 62, 378 N.E.2d 145, quoting *Stephan v. Daniels* (1875), 27 Ohio St. 527, 536, 1875 WL 203. See, also, *State ex rel. Steckman v. Jackson* (1994), 70 Ohio St.3d 420, 426, 639 N.E.2d 83, citing *Johnson v. United Ent., Inc.* (1957), 166 Ohio St. 149, 1 O.O.2d 402, 140 N.E.2d 407.

**{¶76}** The court of appeals' assertions notwithstanding, these cases do not limit the exception to statutes expressly providing that the authorized injunction is cumulative to or exclusive of other legal remedies. To the contrary, these cases recognize that a person proceeding under a specific injunction statute need not satisfy the common-law conditions for injunctive relief, unless the statute provides

otherwise. In its attempt to distinguish the statutes at issue in *Jackson* and *Johnson*, the court of appeals seems to have confused the issue of whether a statute's stated conditions for injunctive relief supersede those of the common law with the question of whether the statute makes the injunction mandatory or discretionary.

{¶77} Nevertheless, the court of appeals correctly noted that one of the stated requirements for injunctive relief under R.C. 1305.08 is that "[a]ll of the conditions to entitle a person to the relief under the law of this state have been met." R.C. 1305.08(B)(3). By virtue of this language, the General Assembly has incorporated into the statute all of the burdens usually imposed upon parties seeking equitable relief, including the requirement that a person seeking injunctive relief must establish the lack of an adequate remedy at law. See 6B Hawkland & Miller, Uniform Commercial Code Series (Rev.2001) 5-155, Section 5-109:3, fn. 5, and 5-161, Section 5-109:4 ("Irreparable injury is an oft stated requirement for injunctive relief"); 7A Lawrence's Anderson on the Uniform Commercial Code (Rev.2001) 595, Section 5-109:32.

{¶78} We hold, therefore, that in order for a court of competent jurisdiction to enjoin the issuer of a letter of credit from honoring a presentation under R.C. 1305.08(B), the court must find that the applicant has no adequate remedy at law.

{¶79} In actions to enjoin honor on the basis of fraud, courts usually find that the applicant has an adequate remedy at law where the alleged injury is capable of being measured in pecuniary terms. While there is some authority to the contrary, most courts find that the availability of a monetary damage award for fraud in the underlying contract constitutes an adequate legal remedy, even if the applicant must travel overseas and submit to the uncertainties of foreign litigation in order to obtain it. On the other hand, the availability of a damage award is usually held to be inadequate where resort to foreign courts would be futile or meaningless, where the beneficiary is insolvent or may abscond with the money drawn, where honoring a draft would likely force the applicant into bankruptcy, or where the

determination of damages would be difficult or speculative. See, e.g*., Key Internatl. Mfg., Inc. v. Stillman* (1984), 103 A.D.2d 475, 479, 480 N.Y.S.2d 528; *GATX Leasing Corp. v. DBM Drilling Corp.* (Tex.App.1983), 657 S.W.2d 178, 183; *Harris Corp. v. Natl. Iranian Radio & Television* (C.A.11, 1982), 691 F.2d 1344, 1356-1357; *Cappaert Ent. v. Citizens & S. Internatl. Bank of New Orleans* (E.D.La.1980), 486 F.Supp. 819, 829-831; *KMW Internatl. v. Chase Manhattan Bank, N.A.* (C.A.2, 1979), 606 F.2d 10, 14-15; *Werner v. A.L. Grootemaat & Sons, Inc.* (1977), 80 Wis.2d 513, 523-525, 259 N.W.2d 310; *Interco, Inc. v. First Natl. Bank of Boston* (C.A.1, 1977), 560 F.2d 480; *Shaffer v. Brooklyn Park Garden Apts.* (1977), 311 Minn. 452, 468, 250 N.W.2d 172; *Dynamics Corp. of Am. v. Citizens & S. Natl. Bank* (N.D.Ga.1973), 356 F.Supp. 991, 1000. See, also, 6B Hawkland & Miller (Rev.2001), at 5-153 to 5-165, Sections 5-109:3 and 5-109:4; 7A Lawrence (Rev.2001), at 596-598, Sections 5-109:35 and 5-109:36.

**{¶80}** In reviewing these and other cases, we find it necessary to stress that the determination of whether an available legal remedy is adequate must be made in accordance with the equitable principles as developed in each respective jurisdiction, and that those principles should not be applied any more liberally or strictly in LC cases than in other cases. Courts should not attempt to alter or manipulate an equitable requirement that is designed for broad-based remedial application in order to advance their personal views of whether and to what extent the legislature should or should not have recognized a fraud exception to the independence principle. R.C. 1305.08(B) already contains a legislative determination that the requirements for equitable relief "under the law of this state," in combination with the other statutory conditions for enjoining LC honor, strike the proper balance between preserving the integrity of the independence principle and preventing fraudulent practices by beneficiaries. Thus, there is neither reason nor legislative directive to apply the inadequate-legal-remedy requirement differently in LC cases than in other cases.

{¶81} In Ohio, "courts of equity are more insistent that the legal remedy shall be in all respects adequate to justify the refusal of the injunction upon that ground." *Hyland,* supra, 74 Ohio St. at 166, 77 N.E. 751. In order to be considered adequate, the legal remedy must "be of such a nature that full indemnity may be recovered without a multiplicity of suits." Id. " 'It is not enough that there is a remedy at law; it must be plain, adequate and complete; or in other words, as practical, and as efficient to the ends of justice and its prompt administration, as the remedy in equity.' " *Culver v. Rodgers* (1878), 33 Ohio St. 537, 545, 1878 WL 23, quoting *Boyce v. Grundy* (1830), 3 Pet. 210, 28 U.S. 210, 215, 7 L.Ed. 655. See, also, *Roof v. Conway* (C.A.6, 1943), 133 F.2d 819, 826-827. Thus, in determining the propriety of injunctive relief, adequate remedy at law "means that the legal remedy must be as efficient as the indicated equitable remedy would be; that such legal remedy must be presently available in a single action; and that such remedy must be certain and complete." *Fuchs v. United Motor Stage Co., Inc.* (1939), 135 Ohio St. 509, 14 O.O. 399, 21 N.E.2d 669, paragraph four of the syllabus.

{¶82} The adequacy of the putative legal remedy is also dependent upon whether "damages might be reasonably estimated." Id. at 521, 14 O.O. 399, 21 N.E.2d 669. Thus, injunctive relief will not be denied on this basis when " ' [t]he damages which might be sought to be recovered in a court of law would be practically impossible of ascertainment, because of the difficulty of determining in advance the quantity of the commodities which will be used.' " Id. at 523, 14 O.O. 399, 21 N.E.2d 669, quoting *Hendler Creamery Co. v. Lillich* (1927), 152 Md. 190, 203-204, 136 A. 631.

{¶83} In the present case, an action to recover damages for fraud would not be an adequate legal remedy because it would not be as prompt, efficient, and practical as the injunction issued by the trial court, and would not provide appellants with certain and complete relief in a single action. The pursuit of such a remedy would likely entail a multiplicity of suits against a number of defendants in several

jurisdictions. The damages that appellants might seek to recover in an action for fraud would be difficult to estimate because of the near impossibility of determining the quantity of winter and summer tires that could or would have been seasonally marketed together and separately, the quantity of the "DA/2C" and other tires not marketable in the United States that could have been sold overseas, and the appropriate market conditions, cost/price differential, and quantity of offered or promised units. While it may be true, as PTZ argues, that appellants accepted some risk of pursuing damages in another nation's courts, it cannot be found that appellants assumed the risk of having to pursue an inadequate legal remedy.

{¶84} Moreover, even if we agreed that appellants could obtain complete and prompt relief in a single action for fraud, we consider it contrary to the expeditious administration of justice to require that appellants now pursue such a remedy. PTZ did not raise the issue of an adequate legal remedy by motion, pleading, or otherwise, at any time prior to trial. Instead, after extensive discovery and a full trial on the merits, PTZ claimed that appellants had an adequate legal remedy for the first time in a post-trial brief. Under these circumstances, and in the interest of eliminating delay and unnecessary expense, PTZ must be found to have waived the issue. See *Culver*, 33 Ohio St. 537.

{¶85} Thus, we find that injunctive relief should not be refused in this case on the basis that Mid-America has an adequate remedy at law. Accordingly, the judgment of the court of appeals is reversed as to this issue.

B

Governing Law

**{¶86}** R.C. Chapter 1305 is Ohio's version of Article 5 of the Uniform Commercial Code ("UCC"). It was enacted in its current form, effective July 1, 1998, to reflect the 1995 revision of Article 5, and is applicable to any LC that is issued on or after its effective date. See 1997 H.B. No. 338, uncodified Section 4.

**{¶87}** Although R.C. Chapter 1305 is the primary source of law governing LCs in Ohio, it "is far from comprehensive." UCC 5-103, Official Comment 2 (1995). It is designed to cover only "certain rights and obligations arising out of transactions involving letters of credit." R.C. 1305.02(A). It is intended to be supplemented by various principles of law and equity that will often apply to help determine those rights and obligations. R.C. 1301.03. And subject to certain exceptions, it allows the parties to vary the effect of its provisions "by agreement or by a provision stated or incorporated by reference in an undertaking." R.C. 1305.02(C). See, also, R.C. 1301.02(C).

**{¶88}** The parties in this case have specifically adopted the UCP as applicable to the present undertaking. In fact, "[m]any letters of credit, domestic and international, state that they shall be governed by the UCP." 3 White & Summers, Uniform Commercial Code (4th Ed.1995) 122, Section 26-3. "When rules of custom and practice are incorporated by reference, they are considered to be explicit terms of the agreement or undertaking." UCC 5-103, Official Comment 2.

**{¶89}** The question that naturally arises from such an incorporation is whether and to what extent R.C. Chapter 1305 will continue to apply to the undertaking. In other words, when a particular LC states that it is subject to the UCP, what is the resulting relationship between the UCP and R.C. Chapter 1305 with regard to that transaction?

**{¶90}** The court of appeals, perhaps unwittingly, took the approach that the entirety of R.C. Chapter 1305 is displaced whenever the UCP is incorporated into a particular transaction. We say "unwittingly" because the court of appeals relied extensively on a case that was decided under a unique provision contained in Alabama's former statutory version of Article 5. In *S. Energy Homes, Inc. v. AmSouth Bank of Alabama* (Ala.1998), 709 So.2d 1180, 1184, the Alabama Supreme Court explained:

**{¶91}** "Section 7-5-114(2), Ala.Code 1975, authorizes courts to issue injunctions that will prevent the issuer in a letter of credit transaction from honoring drafts or demands for payment where there has been a fraud in the issuance of the letter or a fraud in the underlying transaction. *Benetton Services Corp. v. Benedot, Inc.*, 551 So.2d 295 (Ala.1989). *Section 7-5-102(4), however, specifically states that Article 5, including § 7-5-114(2), is inapplicable when letters of credit are subject to the UCP.* The parties stipulated in the letter of credit that the UCP would govern any dispute that might arise in the credit transaction." (Emphasis added.)

**{¶92}** Since no such provision as former Ala.Stat. 7-5-102(4) has ever appeared in either Article 5 or R.C. Chapter 1305, the decision in *S. Energy* must be considered endemic to Alabama.

**{¶93}** Curiously, the court of appeals also quoted from *Nassar v. Florida Fleet Sales, Inc.* (S.D.N.Y.1999), 79 F.Supp.2d 284, 292, in order to demonstrate that the issuer's liability under the UCP is independent of any fraud in the underlying transaction. In *Nassar*, the court explained that "[u]nder New York law, a letter of credit that states it is subject to the UCP is specifically exempted from the Uniform Commercial Code provisions dealing with letters of credit, codified at Article 5. See N.Y. U.C.C. § 5-102(4)." *Id.* at 291. Thus, the New York statute is similar to the former Alabama statute applied in *S. Energy*. Yet the court in *Nassar* pointed out that even under this provision, New York courts hold that the fraud

exception, "codified at N.Y. U.C.C. § 5-114, *is still applicable to letters of credit subject to the UCP*." (Emphasis added.) Id. at 291.

**{¶94}** In those jurisdictions that do not adopt Alabama's former statutory modification of the UCC, parties will not be able to avoid all of Article 5's rules by incorporating the UCP into their undertaking. This is not a situation where one complete set of rules is substituted for another. The scope of the UCP is basically different from that of Article 5. "Because of their different scope, Article 5 [of the UCC] covers some important areas not covered by the UCP, and the UCP covers some important areas not covered by Article 5." 6B Hawkland & Miller (Rev.2001), at 5-46 to 5-47, Section 5-103:3. Each of these bodies of rules will apply to govern the undertaking in their respective areas of coverage, and both will apply concurrently in the event of any overlapping consistent provisions. Id. at 5-47, Section 5-103:3. See, also, 7A Lawrence (Rev.2001) 431, Section 5-101:25.

**{¶95}** It is only when the UCP and R.C. Chapter 1305 contain overlapping inconsistent provisions on the same issue or subject that the UCP's terms will displace those of R.C. Chapter 1305. Thus, when a particular LC states that it is subject to the UCP, the UCP's terms will replace those of R.C. Chapter 1305 only to the extent that "there is a direct conflict between a provision of the UCP and an analogous provision of R.C. Chapter 1305." *Mantua Mfg. Co. v. Commerce Exchange Bank* (1996), 75 Ohio St.3d 1, 661 N.E.2d 161, paragraph one of the syllabus. In other words, "the UCP terms are permissible contractual modifications under [R.C. 1301.02(C) and 1305.02(C)] * * * when a rule explicitly stated in the UCP * * * is different from a rule explicitly stated in Article 5." UCC 5-103, Official Comment 2.

**{¶96}** Thus, the fact that the credit in this case was expressly made subject to the UCP is not dispositive. Instead, the determinative issue is whether a direct conflict exists between the UCP and R.C. Chapter 1305 as to the availability of injunctive relief against honor where fraud is claimed.

{¶97} R.C. 1305.02(D) provides:

{¶98} "Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary."

{¶99} R.C. 1305.07(A) provides:

{¶100} "Except as otherwise provided in section 1305.08 of the Revised Code, an issuer shall honor a presentation that * * * appears on its face strictly to comply with the terms and conditions of the letter of credit."

{¶101} R.C. 1305.08(B) provides:

{¶102} "If an applicant claims that a required document is forged or materially fraudulent or that honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant, a court of competent jurisdiction may temporarily or permanently enjoin the issuer from honoring a presentation."

{¶103} The UCP also adopts the independence principle, but does not provide for a fraud exception. Article 3(a) of the UCP states:

{¶104} "Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the Credit. Consequently, the undertaking of a bank to pay, accept and pay Draft(s) or negotiate and/or to fulfill any other obligation under the Credit, is not subject to claims or defences by the Applicant resulting from his relationships with the Issuing Bank or the Beneficiary."

{¶105} Article 4 explains, "In Credit operations all parties concerned deal with documents, and not with goods, services and/or other performances to which the documents may relate."

**{¶106}** The court of appeals, although guided by its reliance on *S. Energy*, 709 So.2d 1180, found essentially that the UCP's silence on the issue of fraud precludes the applicant from obtaining relief under R.C. 1305.08(B). We disagree.

**{¶107}** In adopting the UCP, "the International Chamber of Commerce undertook to fill in operational details for documentary letter of credit transactions by stating a consensus view of the customs and practice for documentary credits." 6B Hawkland & Miller (Rev.2001), at 5-44, Section 5-103:3. Because "the UCP 'is by definition a recording of practice rather than a statement of legal rules,' [it] does not purport to offer rules which govern the issuance of an injunction against honor of a draft." *Intraworld Indus., Inc. v. Girard Trust Bank* (1975), 461 Pa. 343, 355, 336 A.2d 316, quoting Harfield, Practice Commentary (McKinney's Consol.Laws of N.Y., 1964), Comment 38. Thus, the UCP's silence on the issue of fraud "should not be construed as *preventing* relief under the 'fraud in the transaction' doctrine, where applicable law permits it." (Emphasis sic.) *Wyle v. Bank Melli of Tehran, Iran* (N.D.Ca.1983), 577 F.Supp. 1148, 1164.

**{¶108}** In fact, the overwhelming weight of authority is to the effect that Article 5's fraud exception continues to apply in credit transactions made subject to the UCP. These courts hold, in one form or another, that the UCP's failure to include a rule governing injunctive relief for fraud does not prevent the applicant from obtaining such relief under Article 5. Stated variously, these courts recognize that there is no inherent conflict between the UCP's statement of the independence principle and Article 5's remedy against honor where fraud is charged. Instead, this is merely a situation where Article 5 covers a subject not covered by the UCP. See *W. Sur. Co. v. Bank of S. Oregon* (C.A.9, 2001), 257 F.3d 933; *3Com Corp. v. Banco do Brasil, S.A.* (C.A.2, 1999), 171 F.3d 739, 747; *E & H Partners v. Broadway Natl. Bank* (S.D.N.Y.1998), 39 F.Supp.2d 275, 285; *Prairie State Bank v. Universal Bonding Ins. Co.* (1998), 24 Kan.App.2d 740, 746, 953 P.2d 1047; *Offshore Trading Co., Inc. v. Citizens Natl. Bank of Fort Scott, Kansas*

(D.C.Kan.1987), 650 F.Supp.1487, 1491-1492; *First Commercial Bank v. Gotham Originals, Inc.* (1985), 64 N.Y.2d 287, 295, 486 N.Y.S.2d 715, 719, 475 N.E.2d 1255 , fn. 4; *Wyle,* 577 F.Supp. at 1164; *Harris Corp.,* supra, 691 F.2d at 1354-1355, fn. 19; *Cappaert Ent.,* 486 F.Supp. at 829; *KMW Internatl.,* 606 F.2d at 15, fn. 3; *Stromberg-Carlson Corp. v. Bank Melli Iran* (S.D.N.Y.1979), 467 F.Supp. 530, 532, fn. 5; *United Bank Ltd. v. Cambridge Sporting Goods Corp.* (1976), 41 N.Y.2d 254, 258, 392 N.Y.S.2d 265, 360 N.E.2d 943, fn. 4; *Intraworld Indus., Inc., 461 Pa. 343,* 336 A.2d 316. See, also, 7A Lawrence (Rev.2001) 430, Section 5-101:23, and at 435, Section 5-101:30; 6B Hawkland & Miller (Rev.2001), at 5-47, Section 5-103:3.

{¶109} PTZ concedes that these cases were correctly decided under former UCP Publication No. 400 (1983), which was silent on the issue of fraud. According to PTZ, however, "UCP 500 art. 3, which controls this action, is no longer silent on the fraud exception." Instead, PTZ argues that the last sentence in Article 3 of UCP 500, which did not appear in UCP 400, "specifically speaks to the fraud exception, [and provides that] a fraud claim may not be interposed to bar the collection of [an] L/C." In fact, relying on Documentary Credits, UCP 500 & 400 Compared, International Chamber of Commerce Publication No. 511 (1993), PTZ contends that Article 3 was amended in 1993 for the express purpose of breaking the UCP's long-standing silence on the issue of fraud in order to counteract the effect of the foregoing decisions.

{¶110} PTZ's arguments regarding the amended UCP are ingenious but unavailing. Not all of the decisions applying Article 5's fraud exception to LC's incorporating the UCP involved UCP 400. *W. Sur. Co.,* 257 F.3d 933, and *E & H Partners,* 39 F.Supp.2d 275, dealt with the incorporation of UCP 500. On the other hand, PTZ has not produced any case or other authority suggesting that the incorporation of UCP 500 into an undertaking displaces Article 5's exception for fraud.

**{¶111}** Moreover, the official comments to UCP 511 do not support the notion that Article 3 has now addressed the issue of fraud. The word "fraud" does not even appear in the commentary quoted by PTZ. To the contrary, the Working Group states specifically that the new text of Article 3 operates to deter "the Applicant's demand that payment should be stopped because of the Beneficiary's *breach of his contractual obligations* to the Applicant." (Emphasis added.) Reporting further, the Working Group explains, "This new language in UCP 500 Article 3 clarifies that neither the Beneficiary nor the Applicant can avail himself of any underlying *contractual relationship*." (Emphasis added.)

**{¶112}** The UCP has been amended approximately every ten years since 1962. See 7A Lawrence (Rev.2001) 428, fn. 32, Section 5-101:22. If the current version had finally broken the UCP's longstanding silence on the issue of fraud, one would expect at least a mention of that fact somewhere in the amendatory text or commentary. Yet, one commentator examining the 1993 amendments to the UCP actually laments:

**{¶113}** "The choice of the Working Group not to address the issues of fraud in the tendered documents and/or the sale of goods transaction reflects either an unwillingness to tackle a difficult but necessary issue, or an outdated view of the limited scope of the UCP as merely a codification of bankers' practices rather than a dispositive regime of rules. May a bank decline to pay on a credit when the beneficiary has attempted to defraud the applicant with respect to the goods or the documents? May the applicant and/or the bank petition the court to enjoin payment in this situation? With virtually no guidance from the UCP, these issues fall for determination under the applicable national law." (Footnotes omitted.) Buckley, The 1993 Revision of the Uniform Customs and Practice for Documentary Credits (1995), 28 G.W.J.Intl.L. & Econ. 265, 302-303.

**{¶114}** We hold, therefore, that when a letter of credit expressly incorporates the terms of the UCP, but the UCP does not contain any rule covering

27

the issue in controversy, the UCP will not replace the relevant provisions of R.C. Chapter 1305. Since the UCP does not contain any rule addressing the issue of injunctive relief where fraud occurs in either the credit documents or the underlying transaction, R.C. 1305.08(B) remains applicable in credit transactions made subject to the UCP.

{¶115} Accordingly, the rights and obligations of the parties in this case are governed by R.C. 1305.08(B), and the judgment of the court of appeals is reversed as to this issue.

C

Establishing Fraud Under R.C. 1305.08(B)

{¶116} Having determined the applicability of R.C. 1305.08(B), we must now consider its boundaries. In this regard, we have been asked to decide whether an issuer may be enjoined from honoring a presentation on the basis of beneficiary's fraud in the underlying transaction and to characterize the fraudulent activity justifying such relief.

1

Fraud in the Underlying Transaction

{¶117} May the issuer be enjoined from honoring a presentation under R.C. 1305.08(B) on the basis of the beneficiary's fraudulent activity in the underlying transaction? The short answer is yes, since R.C. 1305.08(B) authorizes injunctive relief where "honor of the presentation would facilitate a material fraud by the beneficiary on the * * * applicant." To fully appreciate the import of this language, however, it is necessary to review some of the history leading to its adoption.

{¶118} Before the independence principle was ever codified, its parameters were set in the seminal case of *Sztejn v. J. Henry Schroder Banking Corp.* (1941), 177 Misc. 719, 31 N.Y.S.2d 631. In that case, the applicant-buyer contracted to purchase a quantity of bristles from the beneficiary-seller, but the seller shipped 50 crates of cow hair and other rubbish. The court concluded that these facts, if

established, could support an injunction against honor. In so doing, the court explained that the independence principle applies "in cases concerning alleged breaches of warranty," but does not extend to a case "involving an intentional fraud on the part of the seller." Id. at 722, 31 N.Y.S.2d 631. In other words, the fraud defense actually " 'marks the limit of the generally accepted principle that a letter of credit is independent of whatever obligation it secures.' " *E & H Partners,* 39 F.Supp.2d at 285, quoting *Rockwell Internatl. Sys., Inc. v. Citibank, N.A.* (C.A.2, 1983), 719 F.2d 583, 588.

{¶119} As originally drafted in 1955, UCC 5-114 provided that a court of appropriate jurisdiction may enjoin honor only if there was forgery or fraud in a required document. See *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d at 260, 392 N.Y.S.2d 265, 360 N.E.2d 943, fn. 5. In 1957, the drafters added language providing that the court may enjoin such honor where "a required document * * * is forged or fraudulent *or there is fraud in the transaction.*" (Emphasis added.) UCC 5-114(2). This rule represents a codification of the *Sztejn* case. *Cambridge Sporting Goods Corp.,* 41 N.Y.2d at 259, 392 N.Y.S.2d 265, 360 N.E.2d 943; 3 White & Summers at 177, Section 26-10.

{¶120} One of the major disputes surrounding former UCC 5-114(2) centered on whether the "transaction" meant only the credit transaction per se or encompassed the underlying transaction as well. As White and Summers explain:

{¶121} "[W]hat is the 'transaction' in which the fraud must have been committed to give rise to the 5-114(2) defense? Must fraud be in the letter of credit transaction, or can it be in the underlying transaction? The courts and commentators are split on the issue whether 'transaction' refers only to the letter of credit transactions or also to the underlying transaction. Those in the 'credit transaction' camp would limit the 'fraud in the transaction' exception to those situations in which the beneficiary has committed fraud on the issuer or has submitted false documents to the issuer. Proponents of this view would argue that

the fraud committed in the *Sztejn* case [177 Misc. 719, 31 N.Y.S.2d 631] equals fraud in the credit transaction because the documents the beneficiary presented to the issuer actively misrepresented the underlying transaction.

{¶122} "In contrast, advocates who argue that the word 'transaction' refers to the underlying transaction read *Sztejn* as a case in which the fraud existed in the underlying sales transaction because the buyer was going to receive rubbish instead of the goods he contracted for. Under this reading of the *Sztejn* case—and consequently under section 5-114(2)—an applicant has the right to enjoin the issuer's payment of a draft if the beneficiary has committed fraud on the applicant in the underlying transaction." (Footnotes omitted.) *Id.* at 179-180, Section 26-10.

{¶123} UCC 5-114(2) was adopted verbatim in Ohio under former R.C. 1305.13(B). In *State ex rel. Barclays Bank PLC v. Hamilton Cty. Court of Common Pleas* (1996), 74 Ohio St.3d 536, 540, 660 N.E.2d 458, fn. 4, the court acknowledged but declined to determine "the question of whether 'fraud in the transaction' in R.C. 1305.13(B) refers to fraud between the customer and the beneficiary in the underlying investment transaction or to fraud in the separate transaction of presentment of a draft for payment."

{¶124} R.C. 1305.08(B) (UCC 5-109[b]) now provides that a court of competent jurisdiction may grant injunctive relief where "honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant." In so doing, R.C. 1305.08(B) refocuses the court's attention away from the particular transaction in which the fraud occurred and toward the level of fraud committed. See 3 White & Summers at 184, Section 26-10. It clarifies that the beneficiary's fraud in either transaction will suffice to enjoin the issuer from honoring a presentation, provided the fraud is material.

{¶125} Thus, UCC 5-109, Official Comment 1, states:

{¶126} "This recodification makes clear that fraud must be found *either* in the documents *or* must have been committed by the beneficiary on the issuer or

applicant. See *Cromwell v. Commerce & Energy Bank*, 464 So.2d 721 (La.1985)." (Emphasis added.)

{¶127} In *Cromwell,* the court explained:

{¶128} "As illustrated in the foregoing cases the independence principle is a strong influence in the decision of cases throughout the country. Adherence to that basic principle is necessary in order to protect the commercial utility of letters of credit.

{¶129} "Nevertheless, the jurisprudence and literature recognize and illustrate the need to extend the meaning of 'fraud in the transaction' at least a step beyond fraudulent documentation. The strongest reason for such an extended interpretation is to deny rewarding fraudulent conduct by letter of credit beneficiaries. One author writes:

{¶130} " 'Notwithstanding dictum to the contrary in some of the cases, the holding of the court in *NMC Enterprises, Inc. v. Columbia Broadcasting System, Inc.* [(N.Y.Sup.1974), 14 U.C.C. Rep.Serv. 1427, 1974 WL 21758] that fraud in the underlying transaction is sufficient to justify relief is the better rule. Since the issuer's obligation on a letter of credit is generally completely independent of the underlying transaction, the customer who obtains a letter of credit assumes the risk that payment may be made when the beneficiary has not properly performed the underlying contract. Moreover, the beneficiary may have required the letter of credit in part to assure that a dispute regarding performance of the underlying contract would not delay payment. By obtaining a letter of credit, however, the customer should not be required to assume the risk of making payment to a beneficiary who has engaged in fraudulent conduct in the underlying transaction. Furthermore, a rule that precludes injunctive relief where the fraud is in the underlying transaction will compensate the beneficiary for wrongful acts in situations where the customer will not have an effective legal remedy for the fraudulent conduct and thus tend to encourage fraud, a policy that should be

avoided. As the court said in *Dynamics Corp. of America v. Citizens & Southern Nat. Bank* [ (N.D.Ga.1973), 356 F.Supp. 991, 1000], there is as much public interest in discouraging fraud as in encouraging the use of letters of credit.' " (Emphasis deleted.) Id., 464 So.2d at 733, quoting 6B Hawkland, at 5-236 to 5-237, Section 5-114:9.

{¶131} In *NMC Ent.*, NMC agreed to purchase a large quantity of stereo receivers from CBS and opened an LC to secure its underlying obligations. In seeking a preliminary injunction to restrain the issuer from honoring the LC, NMC made a prima facie showing that CBS had misrepresented the performance specifications for the receivers, particularly with regard to their continuous power output ratings. In granting the injunction, the court held, "If the sales contract is tainted with fraud in its inducement, then any document or signed certificate which the letter of credit requires CBS to submit * * * is equally tainted." Id., 14 U.C.C. Rep.Serv. at 1430.

{¶132} Moreover, UCC 5-109, 1995 Comment 3 addresses so-called "clean" or "suicide" LCs, which are LCs calling only for a draft and no other document. The comment explains that it would be difficult for there to be fraud in the presentation under these LCs and that courts should be skeptical of such claims. Nevertheless, the comment states that even under these kinds of LCs, "[i]f the applicant were able to show that the beneficiary were [sic] committing material fraud on the applicant *in the underlying transaction*, then payment would facilitate a material fraud by the beneficiary on the applicant and honor could be enjoined." (Emphasis added.)

{¶133} We hold, therefore, that material fraud committed by the beneficiary in either the letter of credit transaction or the underlying sales transaction is sufficient to warrant injunctive relief under R.C. 1305.08(B). Accordingly, the judgment of the court of appeals is reversed as to this issue.

2

Measure of Fraud

**{¶134}** Another controversy that surrounded the "fraud in the transaction" language of UCC 5-114(2) involved the degree or quantity of fraud necessary to warrant injunctive relief. As noted in *Cromwell*, 464 So.2d at 734, "There is more than one measure of 'fraud' in the various jurisdictions in the United States." In fact, manifold tests were devised for establishing fraud under UCC 5-114(2). See, generally, 7A Lawrence (Rev.2001) 353-354, Section 5-114:67; 6B Hawkland & Miller (Rev.2001), at 5-239 to 5-248, Section 5-114:9; 3 White & Summers, at 181-182, Section 26-10.

**{¶135}** However, UCC 5-109(b) (R.C. 1305.08[B]) clarifies that only "material fraud" by the beneficiary will justify an injunction against honor. UCC 5-109, Official Comment 1 explains:

**{¶136}** "Material fraud by the beneficiary occurs only when the beneficiary has no colorable right to expect honor and where there is no basis in fact to support such a right to honor. The section indorses articulations such as those stated in *Intraworld Indus. v. Girard Trust Bank,* 461 Pa. 343, 336 A.2d 316 (1975), *Roman Ceramics Corp. v. People's Nat. Bank*, 714 F.2d 1207 (3d Cir.1983), and similar decisions and embraces certain decisions under Section 5-114 that relied upon the phrase 'fraud in the transaction.' Some of these decisions have been summarized as follows in *Ground Air Transfer, Inc. v. Westate's [Westates] Airlines, Inc.*, 899 F.2d 1269, 1272-73 (1st Cir.1990):

**{¶137}** " ' We have said throughout that courts may not "*normally*" issue an injunction because of an important exception to the general "no injunction" rule. The exception, as we also explained in *Itek [Corp. v. First Natl. Bank of Boston* (C.A.1, 1984)], 730 F.2d [19] at 24-25, concerns "fraud" so serious as to make it obviously pointless and unjust to permit the beneficiary to obtain the money. Where the circumstances "*plainly*" show that the underlying contract forbids the beneficiary to call a letter of credit, *Itek*, 730 F.2d at 24; where they show that the

contract deprives the beneficiary of even a "*colorable*" right to do so, id., at 25; where the contract and circumstances reveal that the beneficiary's demand for payment has "absolutely no basis in fact," id.; see *Dynamics Corp. of America*, 356 F.Supp. at 999; where the beneficiary's conduct has "so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served," *Itek*, 730 F.2d at 25 (quoting *Roman Ceramics Corp.* [supra], 714 F.2d [at] 1212, n. 12, 1215 (quoting *Intraworld Indus.*, 336 A.2d at 324-25)); *then* a court may enjoin payment.' " (Emphasis sic.)

{¶138} As another court adhering to this standard explained, the applicant must show that the letter of credit was, in fact, being used by the beneficiary "as a vehicle for fraud," or in other words, that the beneficiary's conduct, if rewarded by payment, "would deprive the [applicant] of any benefit of the underlying contract and * * * transform the letter of credit * * * into a means for perpetrating fraud." *GATX Leasing Corp.,* 657 S.W.2d at 183.

{¶139} Thus, we hold that "material fraud" under R.C. 1305.08(B) means fraud that has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation can no longer be served.

{¶140} The court of appeals actually did rely on *Sztejn,* 177 Misc. 719, 31 N.Y.S.2d 631, *Intraworld Indus.*, 461 Pa. 343, 336 A.2d 316, and *Roman Ceramics Corp.*, 714 F.2d 1207, to establish its so-called "vitiation exception," but construed the exception so narrowly as to preclude relief where the beneficiary's fraudulent conduct occurs solely in the underlying transaction. Thus, the court of appeals relied on the right cases for the wrong reasons. As a consequence, the court of appeals declined to address the issues of agency and fraud in the underlying contract, holding instead that the trial court should not even have taken evidence on these issues.

{¶141} Accordingly, the judgment of the court of appeals is reversed on this issue as well.

3

PTZ's Actions

**{¶142}** The trial court found the following facts to have been established by clear and convincing evidence:

**{¶143}** "6.  Gary Corby represented to F.A. Jenkins that PTZ Trading, Ltd. was in fact the sole distributor for surplus Michelin tires and that there was a direct relationship between PTZ Trading, Ltd. [a]nd Michelin.  Corby further represented to Jenkins that there would be 50,000 to 70,000 summer tires available to Jenco per quarter at a price 40 to 60 percent below the U.S. market price within weeks of Jenco showing good faith by purchasing in excess of five hundred thousand dollars worth of mud and snow tires currently offered by PTZ Trading, Ltd.

**{¶144}** "7.  The Court further finds that John Evans, as agent for PTZ Trading, Ltd., was aware that Corby was making such representations to Jenco and that such representations were false.  Mr. John Evans, as an agent for PTZ, knew that Jenco considered the purchase of the summer tires to be necessary in order to make the winter snow and mud tires saleable in the U.S. market.  Mr. Evans did nothing to correct Mr. Corby's misrepresentations.  Mr. Evans affirmed the misrepresentations and attempted to buttress them in correspondence with Jenco.

**{¶145}** "8.  Mr. Evans conveyed this information to Mr. Sievers who also acknowledged that he understood that the purchase of the summer tires by Jenco was critical to the conclusion of the sale of the mud and snow tires and without which the winter tire sale would not occur.

**{¶146}** "9.  John Evans and Aloysius Sievers also knew that a large portion of the mud and snow tires they were attempting to sell were not capable of being imported into the United States or sol[d] here because the United States Department of Transportation identification number had been 'buffed' off of such tires.  Both Sievers and Evans knew that Jenco and Mid America Tire intended to sell the snow

tires in the United States, but neither advised Jenco or Mid America Tire of the existence of the 'buffed' tires.

{¶147} "10. Prior to the issuance of the letter of credit, John Evans knew Mid America Tire, Inc. and Jenco were operating under intentionally false and inaccurate representations made by Corby and reinforced by John Evans.

{¶148} "* * *

{¶149} "12. The Court finds, specifically, that the representation that PTZ had a direct relationship with Michelin Tire, the representation that PTZ was the exclusive distributor for surplus Michelin Tires, the representation that a substantial quantity of between fifty and seventy thousand tires would be available quarterly on an exclusive basis to Jenco and Mid America Tire, Inc. at 40 to 60 percent of the U.S. market price were all material statements inducing Plaintiffs to issue the underlying letter of credit and were in fact false and made with knowledge of their falsity."

{¶150} Whether or not this court would have made the same factual findings is irrelevant. This court does not resolve questions of fact. We are constrained to accept these facts as established because the trial court sat as factfinder in this case and because the record contains ample evidence to support them.

{¶151} Given these facts, we are compelled to conclude that PTZ's actions in this case are sufficiently egregious to warrant injunctive relief under the "material fraud" standard of R.C. 1305.08(B). The trial court's findings demonstrate that PTZ sought to unload a large quantity of surplus winter tires on appellants by promising a large number of bargain-priced summer tires, without which the winter tires would be virtually worthless to appellants. Keenly aware that appellants would not agree to purchase the winter tires without the summer tires, PTZ made, participated in, and/or failed to correct a series of materially fraudulent promises and representations regarding the more lucrative summer tires

in order to induce appellants to commit to purchasing the winter tires and to open an LC in PTZ's favor to secure payment. Dangling the prospect of the summer tires just beyond appellants' reach, PTZ sought first the issuance of the LC, and then shipping instructions, in an effort to cash in on the winter deal before appellants could discover the truth about the "DA/2C" tires and PTZ's lack of ability and intention ever to provide summer tires at the price and quantity represented. Indeed, when appellants learned of PTZ's fraud after opening the LC, and PTZ was no longer able to stall for shipping instructions with nonconforming lists of summer tires, Sievers proclaimed, "I have a letter of credit and I am shipping the tires."

{¶152} Under these facts, it can truly be said that the LC in this case was being used by PTZ as a vehicle for fraud and that PTZ's actions effectively deprived appellants of any benefit in the underlying arrangement. In this sense, PTZ's conduct is comparable to the shipment of cow hair in *Sztejn,* 177 Misc. 719, 31 N.Y.S.2d 631, the shipment of old, ripped, and mildewed boxing gloves in *Cambridge Sporting Goods,* 41 N.Y.2d 254, 392 N.Y.S.2d 265, 360 N.E.2d 943, and the failure to disclose nonconforming performance specifications for the stereo receivers in *NMC Ent., Inc.,* 14 U.C.C. Rep.Serv. 1427.

{¶153} PTZ's demand for payment under these circumstances has absolutely no basis in fact, and it would be pointless and unjust to permit PTZ to draw the money. PTZ's conduct has so vitiated the entire transaction that the only purpose served by invoking the independence principle in this case would be to transform the LC into a fraudulent seller's Holy Grail, which once obtained would provide cover for fraudulent business practices in the name of commercial expedience. Accordingly, we reverse the court of appeals' judgment as it bears on this issue.

## IV

## PTZ's CROSS-APPEAL

**{¶154}** In its five separate cross-propositions of law, PTZ essentially argues that Corby was not its agent and that, in any event, appellants could not have justifiably relied on Corby's representations.

A

Corby's Status

**{¶155}** PTZ argues that because appellants "had no direct evidence of PTZ having made Corby its agent," they sought to meet their burden "by pointing to a series of inferences drawn from neutral facts." Relying on *Dunkle v. Std. Life & Acc. Ins. Co.* (1961), 114 Ohio App. 65, 69, 18 O.O.2d 340, 180 N.E.2d 198, and *Zeigler Milling Co. v. Denman* (1946), 79 Ohio App. 250, 252, 34 O.O. 573, 72 N.E.2d 686, PTZ proposes that where different inferences are equally deducible from the same proved facts, neither inference may be indulged. PTZ then reviews various portions of the record bearing on Corby's status in an effort to show that each established fact is qualitatively neutral, permitting the equally deducible inference that Corby was appellants' agent or nobody's agent but his own. PTZ concludes that the trial court's findings of agency were improperly predicated solely "on inferences it drew from facts that produce equally deducible inferences to the contrary." We disagree.

**{¶156}** PTZ has succeeded in showing only that the evidence going to Corby's status in the underlying transaction is circumstantial and would have been sufficient to support differing conclusions. But not all circumstantial evidence is conjectural, and not every inference is speculative. The difference lies essentially in the distinction between a reasonable inference and a guess. *Dunkle* and *Denman* do not, nor could they, proscribe the drawing of reasonable inferences from proved facts. Instead, they preclude the trier of fact from engaging in *speculation*, that is, theorizing about a matter upon which the evidence is *insufficient* to support a conclusion either way.

**{¶157}** With regard to Corby's status in the underlying transaction, the trial court found as follows:

**{¶158}** "Mr. Evans' admission that Corby did the negotiating on behalf of PTZ constitutes an admission that Corby had authority to deal for PTZ, an admission of *actual agency*, although Mr. Evans denies that was the actual relationship with Corby. However, in light of his admission that Corby negotiated on behalf of PTZ, including corresponding for PTZ with Plaintiffs and that Corby 'knew of the pricing levels' for PTZ, knowledge which it would certainly be odd for a competitor's agent to have possession of in a negotiation, the Court concludes that Corby acted as the agent of PTZ in this transaction. At the very least, Evans knew Corby was negotiating on behalf of PTZ and representing himself as having the ability to do that, and Evans allowed Corby to do so and did nothing to correct the situation, leading to agency by estoppel." (Emphasis sic.)

**{¶159}** In addition, Jenkins testified that whenever he "would call Mr. Evans and leave a message or * * * send a fax to Mr. Evans, Mr. Corby would either return the call or a fax would come back from Mr. Corby with the answer." Jenkins also testified that at one point he requested to deal directly with Evans rather than through Corby, but Evans responded that "he was not cutting [Corby] out of the deal."

**{¶160}** On the other hand, Evans testified that Corby had corresponded with Chappell "on behalf of PTZ." However, when asked whether Corby "handle[d] the negotiations for PTZ with regard to this transaction," Evans stated that "at no time was Mr. Corby acting as PTZ. * * * He was not acting on behalf of PTZ." Evans then stated that Corby negotiated on behalf of PTZ only "in so far as that Corby did the negotiations with Mr. Chappell and the price was then agreed between Mr. Corby and myself." Later in his testimony, when asked whether he had previously stated that "Mr. Corby did the negotiations for this deal on behalf of PTZ," Evans

replied, "No, sir, I didn't say that. I said that Mr. Corby was negotiating with PTZ on behalf of Jenco and Mr. Chappell."

{¶161} Considering the totality of the evidence going to Corby's status and the circumstances surrounding his role in the underlying negotiations, we find that in resolving this issue, the trial court did no more than what factfinders are generally charged with doing, which is to draw reasonable inferences from established facts, "view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273.

B

Justifiable Reliance

{¶162} The gist of PTZ's justifiable reliance argument is that appellants should have known prior to applying for the LC that Corby was lying about the "DA/2C" designation, the availability and cost of the summer tires, and PTZ's relationship with Michelin. PTZ reasons that because of the "repeated stonewalling in providing information" to appellants about the summer tires, appellants should have perceived a danger of possible fraud and sought to confirm the veracity of all of Corby's representations. Having failed to do so, appellants cannot show justifiable reliance.

{¶163} The arguments presented on both sides of this issue are lengthy, primarily factual, and supported extensively by evidentiary material that has already been set forth in detail throughout this opinion. We find it wholly unnecessary to revisit these facts and reproduce them anew for purposes of resolving this issue. Suffice it to say that no fraudulent activity, no misrepresentation, and no false promise were discovered or reasonably discoverable by appellants or Chappell prior to the issuance of the LC. It may be true that appellants were hesitant to open the LC because of the nonconforming lists

of summer tires, but they certainly did request and receive confirmation from PTZ on all relevant matters. While hindsight reveals that appellants may have been somewhat too generous or premature with their trust, we cannot say as a matter of law that appellants acted unreasonably at the time, that they failed to exercise due diligence in their dealings with PTZ, or that they should have been alerted to the danger that awaited them. Given the circumstances, it was perfectly reasonable for appellants to accept that PTZ was merely seeking a show of good faith on their part and that conforming summer tire lists would be forthcoming upon the issuance of the LC. There is sufficient evidence from which to conclude that it was not appellants' lack of diligence that failed to expose the fraud in this case, but PTZ's adeptness at keeping it concealed.

V

CONCLUSION

{¶164} Based on all of the foregoing, the judgment of the court of appeals is hereby reversed, and the permanent injunction as granted by the trial court is reinstated.

Judgment reversed.

MOYER, C.J., DOUGLAS, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

PFEIFER and COOK, JJ., dissent.

_____

Wood & Lamping, L.L.P., Eric C. Holzapfel, James D. Houston and Catherine S. Neal, for appellants and cross-appellees.

McCullough, Campbell & Lane, Carl D. Liggio, Paul S. Turner and Bart Rinn, for appellees and cross-appellants.

_____